New York Pet Welfare Association, Inc. v. New York City

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: September 19, 2016    Decided: March 2, 2017)

Docket No. 15-4013-cv

NEW YORK PET WELFARE ASSOCIATION, INC.,

*Plaintiff-Appellant*,

— v. —

CITY OF NEW YORK, NEW YORK CITY COUNCIL, COREY JOHNSON, individually and in his capacity as New York City Councilman, ELIZABETH S. CROWLEY, individually and in her capacity as New York City Councilwoman,

*Defendants-Appellees*,

LINDA B. ROSENTHAL, individually and in her capacity as New York State Assembly Member,

*Defendant*.

Before:

LEVAL and LOHIER, *Circuit Judges*, and KORMAN, *District Judge*.[*]

Appeal from an order of the United States District Court for the Eastern District of New York, *Gleeson, J.*, dismissing a complaint challenging New York City animal welfare laws on Commerce Clause and preemption grounds. The complaint alleged that one law—requiring City pet shops to purchase dogs and cats directly from federally licensed breeders—violated the dormant Commerce Clause and was preempted by the federal Animal Welfare Act, and that another—mandating that pet shops sterilize dogs and cats before releasing them to consumers—was preempted by New York law. The district judge held that the challenged laws do not discriminate against or unduly burden interstate commerce, and do not conflict with either federal or New York law.

AFFIRMED.

JEFFREY M. POLLOCK, (Nancy Elizabeth Halpern, *on the brief*), Fox Rothschild LLP, Lawrenceville, NJ (James M. Lemonedes, Fox Rothschild LLP, New York, NY, *on the brief*), *for Plaintiff-Appellant*.

BENJAMIN WELIKSON, of Counsel (Zachary W. Carter, Corporation Counsel, Richard Dearing, Assistant Corporation Counsel, Devin Slack, of Counsel, *on the brief*), City of New York, New York, NY, *for Defendants-Appellees*.

S. REID KAHN, Kane Kessler, P.C., New York, NY, *for Amicus Curiae The Humane Society of the United States*.

[*] Judge Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

EDWARD R. KORMAN, District Judge:

Home to more than a million dogs and cats,[1] New York City (collectively with two individual defendants, "the City") has long worked to address a tangle of problems surrounding the companion animal business—including irresponsible breeding of animals destined for the City market, their subsequent sale to unwitting consumers, and an overpopulation of unwanted animals. Armed with a new grant of authority from the Legislature, the City enacted a package of laws in 2015 that aimed to mitigate these issues by regulating the sale of dogs and cats in pet shops.

On the day they were to take effect, the New York Pet Welfare Association ("NYPWA") brought this suit to block two of these mandates. The first—the "Sourcing Law"—requires that pet shops sell only animals acquired from breeders holding a Class A license issued under the federal Animal Welfare Act ("AWA"), and the second—the "Spay/Neuter Law"—requires that pet shops sterilize each animal before releasing it to a consumer. NYPWA claims that the Sourcing Law violates the "dormant" Commerce Clause and is preempted by the AWA, and that

---

[1] *See* NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION, *New York City's Pet Population*, STATSBEE'S BLOG (Feb. 14, 2012) (estimating a population of 1.1 million cats and dogs based on a demographic profile of American pet ownership), *archived at* https://perma.cc/X2ZE-ZHZQ.

the Spay/Neuter Law is preempted by New York law.[2] The district judge dismissed NYPWA's entire complaint. *N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 143 F. Supp. 3d 50 (E.D.N.Y.) (Gleeson, J.). NYPWA appeals, and we affirm.[3]

## BACKGROUND

I.      Federal, State, and City Regulation of Commerce in Animals

The commercial breeding and sale of companion animals is subject to a web of overlapping federal, state, and local regulation. The Animal Welfare Act, 7 U.S.C. § 2131 *et seq.*, is the only federal law addressed to the trade and treatment of dogs and cats intended for use as pets. The AWA applies broadly, covering any "dealer"—a "person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of . . . any dog or other animal . . . [for] use as a pet," *id.* § 2132(f)—

---

[2] NYPWA has abandoned its other claims by failing to raise them here. *See Lederman v. N.Y.C. Dep't of Parks and Recreation*, 731 F.3d 199, 203 n.1 (2d Cir. 2013). While it does argue, in one sentence, that the Spay/Neuter Law regulates extraterritorially, we will not consider an undeveloped argument first raised on appeal. *See Harrison v. Republic of Sudan*, 838 F.3d 86, 96 (2d Cir. 2016).

[3] The City previously moved to dismiss for lack of appellate jurisdiction, on the ground that NYPWA had filed its notice of appeal out of time. A motions panel denied the motion. The City urges us in a single paragraph to overrule the motions panel and dismiss the appeal. However, a merits panel will not ordinarily revisit a ruling by a motions panel absent cogent or compelling reasons. *See Lora v. O'Heaney*, 602 F.3d 106, 109 (2d Cir. 2010). The motions panel, with the complete record before it and full briefing on the issue, found that we have jurisdiction, *see id.*, and the City's perfunctory assertion that the panel was wrong does not provide a reason either cogent or compelling to reconsider its decision.

4

but the statute itself does not deal in details. Rather, it sets up a general structure and tells the Secretary of Agriculture to fill in the blanks. The AWA requires most dealers to be federally licensed, *id.* § 2133–34, but leaves it to the Secretary to design the licensing scheme, *see id.* § 2133, and define specific standards of care that dealers must abide by, *id.* § 2143(a)(1).

The Secretary has created three licensing categories of dealers: Class A breeders, Class B distributors, and exempt breeders. Class A breeders include all dealers subject to licensure "whose business involving animals consists only of animals that are bred and raised on the premises." 9 C.F.R. § 1.1. Class B distributors include all dealers subject to licensure "whose business includes the purchase and/or resale of any animal," including brokers who "negotiate or arrange for" the purchase or sale of animals, but do not take possession or ownership of them. *Id.* Exempt breeders do not need licenses so long as they have four or fewer breeding females, and sell only their offspring. 9 C.F.R. § 2.1(a)(3)(iii), (vii).

Despite its breadth, the AWA has always explicitly contemplated continuing state and local regulation of commerce in animals. The Act authorizes the Secretary "to cooperate with the officials of the various States or political subdivisions thereof in effectuating the purposes of this Act and of any State . . . or municipal legislation

5

or ordinance on the same subject." Pub. L. No. 89-544 § 15(b), 80 Stat. 350, 352 (codified as amended at 7 U.S.C. § 2145(b)). Moreover, in 1985, Congress directed that the federal standards applicable to dealers under the AWA "shall not prohibit any State . . . from promulgating standards in addition to those . . . promulgated by the Secretary." Pub. L. No. 99-198 § 1752(b)(3), 99 Stat. 1354, 1647 (codified at 7 U.S.C. § 2143(a)(8)).

Indeed, many states have specifically regulated the sale of dogs and cats. Many of these laws are motivated by concern that large-scale commercial breeders—often maligned (whether fairly or not) as "puppy mills"—prioritize profit over humane treatment and responsible breeding, and target them for special scrutiny. *See*, *e.g.*, N.Y. AGRIC. & MKTS. LAW § 405 (requiring yearly inspections of dealers who sell more than 25 animals per year); *see also* AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, STATE PUPPY MILL CHART (last updated June 16, 2015), *archived at* https://perma.cc/HTK3-ZNQ4.

In addition to regulating large breeders directly, some jurisdictions have also opted to regulate the pet shops through which poorly bred or ill-treated animals are often sold. Some of these laws simply provide consumers additional protection by strengthening warranties and mandating disclosures about the animal. *See, e.g.*, N.Y.

6

GEN. BUS. LAW §§ 751–55. Over the last several years, however, many jurisdictions have enacted laws that sharply limit—or simply eliminate—pet shops' ability to acquire dogs and cats from commercial sources. Three states limit pet shops' sale of commercially bred dogs to animals obtained from federal licensees with clean records.[4] And numerous local governments have gone farther, banning pet shops from selling *any* animal not acquired from a shelter or humane society.[5]

Until recently, New York law blocked any efforts by the City to regulate its own pet shops. The Pet Dealer Act, L. 2000, ch. 259, §§ 2, 4, 2000 N.Y. LAWS 2885, 2888, 2889 (codified at N.Y. AGRIC. & MKTS. LAW § 400-a (repealed 2014); N.Y. GEN.

---

[4] Connecticut requires pet shops to source only from USDA licensees without recent citations for violating the AWA, *see* Act of June 3, 2014, P.A. No. 14-77 § 4, 2014 CONN. ACTS. 408, 411 (Reg. Sess.) (codified at CONN. GEN. STAT. § 22-354(b)); New Jersey accepts sourcing from either USDA licensees without recent citations for violating the AWA, or from animal control facilities, rescue organizations, or shelters, *see* Act of Feb. 5, 2015, P.L. 2015, ch. 7, § 3, 2015 N.J. LAWS 36, 43–44 (codified at N.J. REV. STAT. § 56:8-95.1); and Virginia mandates sourcing either from persons without recent citations for AWA violations, or from a humane society or animal shelter, *see* Act of Mar. 27, 2015, 2015 Va. Acts, ch. 679 (codified at VA. CODE ANN. § 3.2-6511.1).

[5] So far as we are aware, Los Angeles enacted the first local ordinance regulating the sourcing practices of pet shops in 2012, barring all sales of dogs or cats in pet shops except those obtained from animal shelters or humane societies. *See* L.A., Cal., Ordinance 182309 (Sept. 10, 2012) (codified as amended at L.A., CAL., MUNICIPAL CODE § 53.73). Among major cities and counties, Chicago, *see* CHI., ILL., MUNICIPAL CODE § 4-384-015(b), San Diego, *see* SAN DIEGO, CAL., MUNICIPAL CODE § 42.0706, and Las Vegas, *see* LAS VEGAS, NEV., MUNICIPAL CODE § 7.40.315(A), have enacted similar laws. Cook County, Illinois, *see* COOK CTY., ILL., CODE OF ORDINANCES § 10-13(a), allows pet shops to source from Class A breeders in addition to shelters. For a listing of local ordinances banning or limiting the sale of dogs and cats in pet shops, see BEST FRIENDS ANIMAL SOCIETY, JURISDICTIONS WITH RETAIL PET SALE BANS (last visited Jan. 4, 2017), *archived at* https://perma.cc/8DFA-PLWS.

BUS. LAW § 753-e (repealed 2014)), expressly preempted "any local law . . . regulating or licensing pet dealers." In 2014 the Legislature changed course, explicitly providing that nothing in the Pet Dealer Act should be construed to "limit or restrict any municipality from enacting or enforcing a local law . . . governing pet dealers . . . including a law . . . governing the source of animals sold or offered for sale by pet dealers, and the spay or neuter of such animals." Act of Jan. 10, 2014, L. 2013, ch. 553, 2013 N.Y. LAWS 1457 (codified as amended at N.Y. AGRIC. & MKTS. LAW § 407; N.Y. GEN. BUS. LAW § 753-d).

## II.    The Challenged Laws

Shortly thereafter, the New York City Council began considering several new laws regulating pet shops. After multiple hearings and extensive testimony on the proposed regulations, the City enacted, *inter alia*, the Sourcing Law, 2015 N.Y.C. Local Law No. 5 § 2 (Jan. 17, 2015) (codified as amended at N.Y.C. Admin. Code § 17-1702), and the Spay/Neuter Law, 2015 N.Y.C. Local Law No.7 § 3 (Jan. 17, 2015) (codified as amended at N.Y.C. Admin. Code § 17-804(b)).

The Sourcing Law provides that City pet shops may obtain dogs or cats *only* directly from federally-licensed Class A breeders (who sell only animals bred and raised on their own premises). N.Y.C Admin. Code § 17-1702(a)(1). Moreover, pet

8

shops may buy only from breeders whose federal license has not been suspended within the last five years, *id.*, have not been recently cited for violating the AWA by the U.S. Department of Agriculture, *see id.* § 17-1702(a)(2), and provide a sworn affidavit that they have never been convicted of violating certain animal protection laws, *id.* § 17-1702(a)(3)–(4). Pet shops are also expressly forbidden from selling animals knowingly obtained from Class B distributors (who purchase and resell animals), *id.* § 17-1702(b), and forbidden by implication from selling animals obtained from exempt breeders (who cannot obtain a Class A license because they have fewer than five breeding females). Notably, the same sourcing rules do not apply to animal shelters or animal rescue organizations.

The Spay/Neuter Law prohibits pet shops from releasing any dog or cat to a consumer unless it has been sterilized by a veterinarian. *Id.* § 17-804(b). The Law specifically defines "sterilization" as such an operation performed on a "dog or cat that is at least eight weeks of age and that weighs at least two pounds." *Id.* § 17-802(i). Animal shelters are also generally required to sterilize dogs and cats before releasing them, *id.* § 17-804(a), but their obligation to do so is subject to a number of exceptions not applicable to pet shops, *see id.* § 17-804(a)(1)–(4).

9

**DISCUSSION**

Review of a dismissal under Fed. R. Civ. P. 12(b)(6) is de novo. We consider the facts alleged in the complaint, documents attached to it or incorporated by reference, and matters subject to judicial notice, *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014) (per curiam). We accept well-pleaded allegations and draw all reasonable inferences in the plaintiff's favor. *Id.*

I.      Federal Preemption

*A.      Obstacle Preemption*

NYPWA argues that the district judge erred in holding that the Sourcing Law is not preempted by the AWA. There are several well-established categories of preemption, *see generally Arizona v. United States*, 132 S. Ct. 2492, 2500–01 (2012), but NYPWA alleges only that one—obstacle preemption—applies here. Federal law preempts conflicting state laws, and the Supreme Court has long recognized that a conflict exists when a state law "stands as an obstacle to the accomplishment . . . of the full purposes and objectives of" federal law. *Id.* at 2501 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). NYPWA argues that the Sourcing Law obstructs the Animal Welfare Act by interfering with its system of licensing for animal dealers. We disagree.

10

Preemption analysis rests on two fundamental principles. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). First, every preemption case starts with the presumption that Congress did not intend to displace state law. *Id.* Because this presumption rests on our "respect for the States as independent sovereigns in our federal system," *id.* at 565 n.3 (internal quotation marks omitted), it is especially strong in areas where states traditionally wield police powers, *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013); *see also Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2013). The heavy burden of overcoming this presumption falls on the party alleging preemption, *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 414 n.21 (2d Cir. 2013) (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984)), who must show that the conflict between the federal and state laws "is so direct and positive that the two . . . cannot be reconciled or consistently stand together," *In re MTBE*, 725 F.3d at 102 (quoting *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006)).

Second, since preemption is ultimately a question of statutory construction, it is always a matter of intent, "even where that intent must be inferred." *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 110 (2d Cir. 2016), *petition for cert. pending*, No. 16-317 (filed Sept. 9, 2016). We look to the intent of Congress to

11

determine the preemptive force of a statute, *id.*, but in evaluating preemption by a regulation, we focus on the agency's intent, *City of New York v. F.C.C.*, 486 U.S. 57, 64 (1988). Divining Congress's intent is always "a matter of judgment, to be informed by examining the federal [scheme] as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). We apply the same "ordinary pre-emption principles" whether the relevant federal law is a statute or a regulation. *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 874 (2000). We turn to that inquiry now.

B.      *The Animal Welfare Act Does Not Preempt the Sourcing Law*

Because obstacle analysis hinges on the purposes of the federal scheme, "we must first ascertain those objectives as they relate to the federal law[s] at issue." *In re MTBE*, 725 F.3d at 102. NYPWA's federal preemption claim is very specific, arguing only that the Sourcing Law obstructs the system of dealer licenses authorized by the AWA and implemented by the Secretary of Agriculture. The threshold task, then, is to determine the purpose of *that licensure scheme* as it relates to the broader objectives of the AWA and its implementing regulations.

Nevertheless, despite NYPWA's narrow focus, neither party squarely addresses the issue. The City argues wrongly that the AWA does not preempt the

12

Sourcing Law because they share the goal of promoting the humane treatment of animals. Broad harmony of purpose will not save a state law from preemption if it "interferes with the methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Oullette*, 479 U.S. 481, 494 (1987). NYPWA misses the point as well when it focuses too narrowly on the fact that the Sourcing Law blocks particular pet dealers from acting in ways that federal law standing alone would allow. It explains how those strictures interfere with the business models of *individual licensees*, but not how they interfere with the role of the licensing *system* in advancing the statute's overall goals. The question is whether the Sourcing Law blocks the licensure system from fulfilling the specific role that Congress and the Secretary of Agriculture intend it to play in advancing the goals of the AWA.

Neither Congress nor the Secretary has explained the purpose of licensure in the overall AWA scheme. Nevertheless, a careful analysis of the AWA's provisions suggests that licensure is best understood as a system of compulsory registration designed to require dealers to provide information that would facilitate the Act's objective of creating a nationwide system of animal welfare inspections.

Inspections are central to the AWA: the statute directs the Secretary to carry out inspections to determine whether dealers are violating the Act, 7 U.S.C.

§ 2146(a), and requires that federal inspectors have access to dealers' premises, animals, and records, *id.* The regulations implementing that provision give federal officials broad latitude to inspect and document all aspects of a dealer's business without giving prior notice. *See* 9 C.F.R. § 2.126. Indeed, the portion of the statute captioned "Administration and enforcement" deals exclusively with empowering the Secretary to inspect and otherwise investigate regulated parties. *See* 7 U.S.C. § 2146. Put simply, the Secretary's nationwide authority to proactively inspect for violations is the AWA's primary enforcement mechanism. *See* U.S. DEPARTMENT OF AGRICULTURE, ANIMAL WELFARE ACT ENFORCEMENT (last modified Oct. 3, 2016), *archived at* https://perma.cc/YRK4-7ENE.

Of course, to make a nationwide inspection program effective, the Secretary has to know what to inspect. At a minimum, he has to know who the dealers are and where to find them. But that presents a problem—how is the Secretary supposed to get that information? To be sure, Congress could have directed him to simply start looking for dealers on his own. But even in 1966 the AWA swept broadly, covering "live dogs, cats, monkeys . . . , guinea pigs, hamsters, and rabbits," *see* Pub. L. 89-544 § 2(h), 80 Stat. 350, 351 (1966), and the job of finding every dog and cat dealer in the United States (to say nothing of its hamsters) would have been enough to make the

14

Secretary, in his few, fleeting, hopeful moments, wish longingly to trade places with Sisyphus. The AWA aims to solve this problem through a system of compulsory licensure. In requiring dealers to obtain federal licenses, the Act and the Secretary's regulations require regulated parties to make themselves known to regulators, and to turn over the information that is pertinent to enforcing the Act.

We also note that this view of licensure as facilitating inspection finds some measure of support in the Department of Agriculture's approach to the AWA. *Cf. Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) (noting that courts may consider "an agency's explanation of how state law affects" federal regulation). Its regulations, for example, generally do not prescribe the information required to obtain a license, *except* to expressly require that applicants provide a mailing address and "a valid premises address where animals, animal facilities, equipment, and records may be inspected for compliance." 9 C.F.R. § 2.1(a)(1). The Secretary's decision to require a satisfactory inspection as a precondition to the issuance of a license also suggests that the agency intends licensure to further the AWA's enforcement mechanisms. *See* 9 C.F.R. § 2.3(b). Moreover, in a recent statement of basis and purpose, the Secretary justified his decision to exempt certain small breeders from licensing on the grounds that, as "low-risk" facilities, they did not need "Federal oversight." 78

15

Fed. Reg. 57227, 57240 (2013). Since inspection constitutes the bulk of oversight, the agency's decision to forego licensing where oversight is unnecessary is consistent with our view that licensure is an administrative mechanism meant to facilitate the inspection regime that gives the AWA teeth.

The second step in our analysis is ascertaining whether the Sourcing Law stands as an obstacle to that purpose. It clearly does not. Breeders and distributors' ability to sell to City pet shops has no bearing on the licensing scheme's ability to facilitate federal enforcement activities. Distributors will still have to get licenses, will still have to provide information to federal officials, and will still have to open their facilities to federal inspection. And of course, exempt breeders will still be excluded from the licensing system as a matter of federal law.

### C. NYPWA's Preemption Arguments Are Meritless

NYPWA's arguments appear to rest on a very different view of licensure's role that is never clearly articulated, but that we nevertheless consider and reject. NYPWA argues that the AWA's regulations grant animal dealers a federal right to engage in any line of business they wish without state interference. NYPWA finds these rights in both federal action—licensing certain animal dealers—and federal inaction—determining that other animal dealers do not need licenses. The unspoken

16

but inescapable implication of NYPWA's position is that the Secretary's intent was simply to preempt the field of trade in animals.

Where Congress legislates in an area that is within the states' traditional police powers, intent to preempt the field will ordinarily not be inferred unless such intent is "clear and manifest." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (internal quotation marks omitted). This is just such a field, *see, e.g., Reid v. Colorado*, 187 U.S. 137, 148 (1902) (upholding a state statute regulating trade in cattle and horses sourced from certain areas as a valid exercise of police powers), and we do not detect the requisite intent in the licensure system. The mere creation of a federal licensing scheme does not indicate that Congress wanted to displace state law. *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141–42 (1963).

Significantly, the text of the AWA unambiguously envisions continuing state animal welfare regulation. Congress has expressly authorized the Secretary, in implementing the Act, to "cooperate with" local officials "in carrying out the purposes of . . . [the AWA] and of any State, local, or municipal legislation or ordinance on the same subject." 7 U.S.C. § 2145(b). The Secretary may preempt only to the extent that Congress has delegated him the power to do so. *Fid. Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153–54 (1982). Section 2145(b)'s explicit grant

17

of authority to the Secretary to cooperate with state officials carrying out state law makes it clear that Congress did not intend that the statute displace all state regulation of the field.

## II.   Commerce Clause

### A.   Overview

The Commerce Clause empowers Congress "to regulate Commerce . . . among the several States," U.S. CONST. Art. I, § 8, cl. 3, but also has a corresponding "negative" or "dormant" aspect that "limits the power of local governments to enact laws affecting interstate commerce." *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 47 (2d Cir. 2007). Analysis of state and local laws under the dormant Commerce Clause treads a well-worn path. First, we determine whether the challenged law "discriminates against interstate commerce," or "regulates evenhandedly with only incidental effects on interstate commerce."*Id.*

In this context, discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994); *see also Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 74 (2d Cir. 1998). Discriminatory laws are permissible only if the state shows they are "demonstrably

18

justified by a valid factor unrelated to economic protectionism." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992). This justification must show "a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (quoting *Oregon Waste*, 511 U.S. at 101).

Laws that impose only incidental burdens on interstate commerce, however, are subject to a much more forgiving standard. Under the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), we will uphold a nondiscriminatory law unless the challenger shows that "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."

B.    *The Sourcing Law Does Not Discriminate Against Interstate Commerce*

The Supreme Court has recognized three modes of discrimination against interstate commerce: a law may discriminate on its face, harbor a discriminatory purpose, or discriminate in its effect. *Town of Southold*, 477 F.3d at 48. On appeal, NYPWA raises three different theories of discriminatory effect.

First, NYPWA contends that the Sourcing Law discriminates against out-of-state breeders, because "many" (not all), *see* Second Amended Complaint at ¶ 147, of them cannot afford the expense of reaching the New York City marketplace

19

except by selling to Class B distributors, who resell animals to pet shops but are now prohibited from engaging in such commerce within the City. The Commerce Clause, however, "protects the interstate market, not particular interstate firms." *Exxon Corp. v. Maryland*, 437 U.S. 117, 127 (1978). The Sourcing Law may make it difficult or impossible for some out-of-state breeders to sell to City pet shops, but so long as others are able to, "interstate commerce is not subjected to an impermissible burden simply because a[] . . . regulation causes some business to shift from one interstate supplier to another." *Id.*

Based on NYPWA's complaint, we have every reason to believe that some out-of-state breeders will sell directly to City pet shops. After all, NYPWA alleges that pet shops depend on puppy sales for a significant portion of their revenues, Second Amended Complaint at ¶ 41, and that the vast majority of Class A breeders are located outside New York, *id.* ¶ 44. With or without the Sourcing Law, City pet shops will need to import puppies into New York, and the interstate market will have every incentive to meet demand. The Sourcing Law is not invalid merely because it favors out-of-state breeders who are able to make direct sales over those who are not.

NYPWA's second theory of discriminatory effect is that by shifting the City pet market away from pet shops—which buy most of their animals from dealers outside New York—and towards animal shelters and rescues ("rescue entities"), the Sourcing Law disadvantages out-of-state pet dealers in favor of local rescue entities for access to the City pet market. The City, in turn, contends that commercial dealers and rescue entities are so dissimilarly situated as to be incomparable. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). We need not resolve the City's argument, because even assuming that the two are similarly situated, NYPWA still fails to show discrimination against interstate commerce. The complaint alleges that rescue entities are vigorous participants in the *interstate* market for companion animals. Rescue entities "obtain dogs and cats from across the country," Second Amended Complaint at ¶ 162, which they sell "throughout the City," *id.* ¶ 164. To the extent the Sourcing Law makes it easier for rescue entities, and harder for breeders, to compete in the City, it merely shifts business from one interstate actor to another.

Finally, NYPWA argues that the Sourcing Law discriminates against interstate commerce because the vast majority of Class B distributors (who buy from breeders for resale to pet shops, and are barred by the Sourcing Law from selling to City pet shops) are located outside New York. The Supreme Court has considered and

rejected the argument that a "statute is discriminatory because it will apply most often to out-of-state entities" in a market that has more out-of-state than in-state participants, *CTS Corp. v. Dynamics Corp. Of Am.*, 481 U.S. 69, 88 (1987), and there is no need to say any more here.

C. *The Sourcing Law Survives* Pike *Balancing*

Because the Sourcing Law does not discriminate against interstate commerce, under the *Pike* balancing test, we will uphold it unless NYPWA can show that the incidental burden it imposes on such commerce is clearly excessive in relation to the local benefits. 397 U.S. at 142. An incidental burden is one that weighs more heavily on interstate commerce than intrastate commerce. *Town of Southold*, 477 F.3d at 50 (quoting *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001)). We have recognized three types of "incidental" burdens: regulations that have a disparate impact on in- versus out-of-state entities, laws that regulate beyond the state's borders, and laws that create regulatory inconsistencies between states. *Id.* (quoting *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 156–57, *aff'd* 550 U.S. 330 (2007)).

First, NYPWA fails sufficiently to allege that the burden of selling directly to City pet shops, rather than through distributors, will fall disproportionately on out-

22

of-state breeders. Even drawing the extremely favorable inference that the burden of direct sales will correlate directly with the seller's distance from the City, NYPWA still has not pled a disparate impact. The cost of doing business in many markets is higher for faraway sellers than for nearby ones, and the Sourcing Law does not violate the Commerce Clause merely because of that fact. Where the cost of compliance with the Sourcing Law would be the same in Pittsburgh as in Buffalo, the Law cannot be said to impose a special burden on *interstate* commerce.

Second, NYPWA does not demonstrate that the Sourcing Law "directly controls commerce occurring wholly outside" of New York. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). It argues that the Sourcing Law will have such an effect when out-of-state exempt breeders increase the scale of their operations in order to qualify for Class A licenses, which are only available to breeders with more than four breeding females. The Commerce Clause, however, does not void every law that causes behavior to change in other states. Rather, the measure of extraterritoriality is whether the Sourcing Law "inescapably require[s]" breeders to operate on the City's terms even when doing business elsewhere. *See Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001). That standard is not met here, where

the Sourcing Law attaches no significance to breeders' conduct with respect to animals sold outside the City.

Finally, NYPWA has pled no facts indicating that the Sourcing Law is "in substantial conflict with a common regulatory scheme in place in other states." *Id.* at 112. The complaint contains no allegations at all that the Sourcing Law will create an interstate regulatory conflict. Even if we were to consider allegations raised for the first time on appeal, NYPWA's opening brief simply concludes, without support, that the Sourcing Law conflicts with the laws of other states. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). NYPWA does cite some examples in its reply brief, but they do not conflict either with the Sourcing Law or with each other—a breeder may simultaneously hold a Class A license and possess only five breeding females[6], each of which produces only one litter per year.[7] We need not explore hypothetical conflicts of our own design, since "[i]t is not enough to point to a risk of conflict[] . . . ; there must be an actual conflict between the challenged regulation and those [already] in place." *Sorrell*, 272 F.3d at 112.

---

[6] *See* COOK CTY., ILL., CODE OF ORDINANCES § 10-13(a)(ii) (barring pet shops from selling dogs obtained from a breeder unless the breeder "owns or possesses no more than five female dogs [or] cats . . . capable of reproduction").

[7] *See* SUNRISE, FL., CODE OF ORDINANCES § 4-7.

24

Moreover, the City has identified a number of local benefits that are clearly unrelated to economic protectionism. *See Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992). Requiring pet shops to purchase directly from Class A breeders protects consumers by making it impossible to obscure the source of an animal by using a middleman, enhances animal welfare by reducing the incidence of disease and behavioral problems associated with irresponsible breeding, and alleviates the burden of providing care in public shelters for animals abandoned because of such problems.

Nevertheless, because we hold the Sourcing Law to be nondiscriminatory, there is no reason to reach the question of whether these non-protectionist justifications would be sufficient to overcome a presumption of *per se* invalidity, *see Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008), and because NYPWA has not demonstrated any incidental burden on interstate commerce, there is no need to consider the weight these local benefits should carry in the *Pike* balancing test. Because the Sourcing Law imposes no incidental burdens on interstate commerce, it cannot impose any that are clearly excessive in relation to its local benefits, and therefore survives scrutiny under the dormant Commerce Clause. *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1288 (2d Cir. 1995).

III. State Preemption

   *A. Municipal Powers and Preemption in New York*

New York law grants broad powers to local governments to make their own laws "to the extent that they are not inconsistent with either the State Constitution or any general law." *Eric M. Berman, P.C. v. City of New York*, 25 N.Y.3d 684, 690 (2015). This includes a general police power to adopt local laws relating to "the government, protection, order, conduct, safety, health and well-being of persons or property." N.Y. CONST. art. IX, § 2(c)(10). The powers of local government are construed liberally in New York, *id.* § 3(c), but may nevertheless be preempted by the state legislature. The New York Court of Appeals has explained that a local law is preempted "where there is a direct conflict with a state statute (conflict preemption)" or where the local law is inconsistent with state law because it "prohibit[s] what would be permissible under State law, or impose[s] prerequisite additional restrictions on rights under State law, so as to inhibit the operation of the State's general laws." *Berman*, 25 N.Y.3d. at 690 (internal quotation marks omitted).

   *B. The Spay/Neuter Law is Not Preempted Under New York Law*

The Spay/Neuter Law is not preempted by New York's laws governing veterinary medicine, or by its animal cruelty laws. NYPWA argues that sterilizing

26

a dog or cat at the minimum age and weight allowed by the Law—8 weeks old, and two pounds—while the animal is still in the custody of the pet shop, would violate a veterinarian's purported duties under New York law to (1) apply independent professional judgment, and (2) obtain the informed consent of the owner, before performing a surgical procedure. We describe these duties as "purported" because NYPWA has failed to identify a single New York statute or case that imposes them.

Nevertheless, there is no need to probe the depths of veterinarians' professional obligations, because even assuming that NYPWA is right, they still have not stated a preemption claim. As the district judge noted, the Law imposes no obligations on veterinarians. If a veterinarian feels that performing a surgery would violate her obligations under any New York law, she may simply refuse.

Nor is the Spay/Neuter Law preempted by § 753-d of New York's General Business Law, which expressly prohibits any local law that "result[s] in essentially banning all sales of dogs or cats raised and maintained in a healthy and safe manner." In support of its claim, NYPWA's briefing spins out the following doomsday scenario: Pet shops only have a market for dogs and cats younger than twelve weeks. But sterilizing an animal that young is (allegedly) a serious violation of veterinary ethics. So no veterinarian will sterilize the puppies and kittens, which

pet shops will then be forbidden to sell. As a result, the sale of puppies and kittens in the City will effectively be banned. NYPWA argues that because there is no market for dogs and cats other than puppies and kittens under twelve weeks of age, a ban on the sale of such animals effectively bans all sales of dogs and cats.

No New York court has spoken on the preemptive scope of § 753-d. Nevertheless, NYPWA fails to state a claim for preemption even on its own terms. The complaint does not allege that there is *no market* for twelve-week-old animals, only that consumers *prefer* younger ones. Put differently, NYPWA does not allege that no market would exist for twelve-week-old animals, because it does not allege that consumers would refuse to buy any animals at all if those aged twelve weeks and up were the only ones available.

## CONCLUSION

The Sourcing and Spay/Neuter Laws address problems of significant importance to the City and its residents. It appears that the City has enforced them for more than a year, with no apparent ill effects.[8] Because the challenged laws are

---

[8] In the district court, the City agreed not to enforce the challenged laws through October 31, 2015. That date has long passed, and neither party has advised us that the City is not enforcing the laws.

28

not preempted by either state or federal law, and do not offend the Commerce

Clause, we Affirm the district court's order dismissing NYPWA's complaint.