In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3711

PARK PET SHOP, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 C 1450 — **Jorge L. Alonso**, *Judge*.

ARGUED MAY 24, 2016 — DECIDED SEPTEMBER 21, 2017

Before ROVNER, SYKES, and HAMILTON, *Circuit Judges*.

SYKES, *Circuit Judge*. This case challenges Chicago's "puppy mill" ordinance, which limits the sources from which pet stores may obtain dogs, cats, and rabbits for resale. The ordinance provides that pet retailers in the city "may offer for sale only those dogs, cats, or rabbits" obtained from an animal control or care center, pound, or kennel operated by local, state, or federal government or "a

humane society or rescue organization." CHICAGO, ILL., CODE § 4-384-015(b) (2016).

Two Chicago pet stores and a Missouri dog breeder sued to invalidate the ordinance. They allege that it exceeds Chicago's home-rule powers under the Illinois Constitution and violates the implied limits on state power imposed by the Commerce Clause of the United States Constitution. The district court dismissed the suit for failure to state a claim.

We affirm. The Illinois Constitution permits home-rule units like Chicago to regulate animal control and welfare concurrently with the state. And the puppy-mill ordinance doesn't discriminate against interstate commerce, even in mild practical effect, so it requires no special cost-benefit justification under the Commerce Clause. Rational-basis review is the default standard, and the ordinance easily passes that test.

## I. Background

In 2014 the Chicago City Council acted to address concerns that pet stores in the city sourced their animals from large mill-style breeders, which are notorious for deplorable conditions and abusive breeding practices, including over-breeding, inbreeding, crowded and filthy living conditions, lack of appropriate socialization, and inadequate food, water, and veterinary care. The Council determined that mill-bred pets develop health and behavioral problems, creating economic and emotional burdens for pet owners and imposing financial costs on the City as owners abandon their physically or emotionally challenged pets or surrender them to the shelter operated by the City's Commission on Animal Care and Control. Nearly a third of all animals that

come into the City's care are owner surrenders—the second largest source of dogs and cats taken in by the Commission (strays are the largest). Chicago budgets about $300,000 each year for its shelter service and spends more than $500,000 every year to euthanize animals.

The Council determined that extinguishing the supply of puppy-mill pets to local pet stores would serve several important policy goals. Among other things, it would (1) limit financial support to mill operators; (2) reduce the financial and emotional toll on Chicago consumers who purchase mill-bred pets with latent physical and behavioral problems; (3) boost placement of shelter pets; and (4) reduce the City's animal-care and euthanization costs. The Council also determined that banning the retail sale of mill-bred pets may also promote pet adoption from the City's shelter, which would benefit Chicago residents because the $65 pet adoption fee both offsets the cost to taxpayers of operating the shelter and gives Chicagoans ready access to cheaper pets.

The Council accordingly adopted the following ordinance restricting the sources from which pet stores in the city may obtain dogs, cats, or rabbits for resale:

> (b) *Restrictions on the retail sale of animals.* A retailer may offer for sale only those dogs, cats, or rabbits that the retailer has obtained from:
>
>> (1) an animal control center, animal care facility, kennel, pound or training facility operated by any subdivision of local, state or federal government; or

> (2) a humane society or rescue organiza-
> tion.

CHICAGO, ILL., CODE § 4-384-015(b) (2016).

Two Chicago pet stores—Park Pet Shop and Pocket Pets—joined forces with Cedar Woods Farm, a Missouri dog breeder, seeking to invalidate the ordinance. They allege that it exceeds Chicago's home-rule powers under the Illinois Constitution and amounts to an unconstitutional regulation of interstate commerce in violation of the dormant aspect of the Commerce Clause. Amended complaints followed—the operative version is the second amended complaint—and the City moved to dismiss for failure to state a claim. *See* FED. R. CIV. P. 12(b)(6). The district judge granted the motion, holding that the ordinance is a valid exercise of the City's home-rule authority under the Illinois Constitution and is not an unconstitutional regulation of interstate commerce under the Commerce Clause. The judge entered final judgment for the City, and the plaintiffs appealed.

## II. Discussion

We review a dismissal order without deference to the district court's decision, accepting as true the well-pleaded facts in the complaint and drawing reasonable inferences in the plaintiffs' favor. *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). To survive a motion to dismiss under Rule 12(b)(6), the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable" as alleged in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A bit of background about Chicago's regulatory scheme helps to place the state and federal constitutional claims in proper context. To operate a pet shop in Chicago requires a license from the City. CHICAGO, ILL., CODE § 4-384-020(a) (2016). The City's animal-care ordinance defines "pet shop" broadly as "any person primarily engaged in the business of selling or offering to sell animals suitable for use as pets," but excludes "the isolated or occasional sale of animals by a person who sells only such animals that he has produced and raised" and "any person engaged in the business of breeding who owns, has possession of, or harbors 5 or fewer female dogs or cats capable of reproductions and sells only those breeding dogs or cats or their offspring." *Id.* § 4-384-010. Also excluded are "any animal control center, animal care facility, kennel or pound or training facility" operated by a local, state, or federal government. *Id.*

Licensees must comply with a host of regulations governing the housing and care of animals offered for sale. For example, the ordinance imposes requirements designed to ensure a sanitary environment for the animals. *Id.* § 4-384-050. It sets basic standards of animal care. *Id.* § 4-384-055. It regulates cage size and quality. *Id.* § 4-384-100. And it requires licensees to submit to regular inspections by city inspectors. *Id.* § 4-384-130.

Though Chicago's existing regulatory scheme was already extensive, the puppy-mill ordinance is a far more significant restriction. It narrowly limits the sources from which pet retailers may obtain animals for resale: "A retailer may offer for sale only those dogs, cats or rabbits" obtained

from an animal care or control facility operated by a unit of local, state, or federal government or from "a humane society or rescue organization." *Id.* § 4-384-015(b). A "retailer" is "any person licensed or required to be licensed under this chapter who offers for sale any dog, cat or rabbit in the City." *Id.* § 4-384-015(a).

The ordinance thus effectively prohibits large commercial breeders from supplying dogs, cats, and rabbits to pet retailers in the city. This dramatically changes the business model of Chicago's pet retailers, so it's no surprise that litigation commenced soon after the City adopted the ordinance. This suit alleges that the ordinance is constitutionally infirm in two respects—one state, one federal. We'll begin with the state constitutional claim.

**A. Home-Rule Authority Under the Illinois Constitution**

As a home-rule municipality under the Illinois Constitution, Chicago "may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." ILL. CONST. art. VII, § 6(a). This constitutional provision "was written with the intention that home rule units be given the broadest powers possible." *Scadron v. City of Des Plaines*, 606 N.E.2d 1154, 1158 (Ill. 1992). The state constitution further provides that a municipality with home-rule status may "exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." ILL. CONST. art. VII, § 6(i).

To determine whether the puppy-mill ordinance is a permissible exercise of Chicago's home-rule powers, we follow the Illinois Supreme Court's instructions and evaluate the "nature and extent of the problem" at hand and whether the state has a "vital interest and a traditionally exclusive role" in regulating it. *City of Chicago v. StubHub, Inc.*, 979 N.E.2d 844, 852–53 (Ill. 2011). These are commonly referred to as the *Kalodimos* factors. *Kalodimos v. Village of Morton Grove*, 470 N.E.2d 266 (Ill. 1984) (developing the doctrine).

The puppy-mill ordinance is aimed at reducing the social problems and economic costs associated with mill-bred pets: the emotional and financial costs incurred by individual Chicagoans who find themselves with sick or troubled pets and the financial strain on the public fisc caused by mill-bred animals. State and local governments alike are vitally concerned with issues of animal control and welfare, and both governments have long regulated animal welfare concurrently. *See, e.g.*, *County of Cook v. Village of Bridgeview*, 8 N.E.3d 1275, 1279 (Ill. 2014), *appeal denied*, 23 N.E.3d 1200 (Ill. 2015) ("In Illinois, the problem of animal control, overpopulation, and the spread of rabies is both a local and statewide concern."). State government has never had an exclusive role in addressing animal-control issues; concurrent regulation is the norm.

In areas of concurrent authority, the Illinois Constitution expressly requires a clear statement from the state legislature to oust a municipality's home-rule power. *See* 5 ILL. COMP. STAT. 70/7 (2015) ("No law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of Section 6 of

Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit."). No state animal-control statute explicitly ousts or limits Chicago's power to regulate in this area.

To the contrary, state law *preserves* municipal power to regulate animal care and welfare:

> Nothing in this Act shall be held to limit in any manner the power of any municipality or other political subdivision to prohibit animals from running at large, nor shall anything in this Act be construed to, in any manner, limit the power of any municipality or other political subdivision to further control and regulate dogs, cats or other animals in such municipality or other political subdivision provided that no regulation or ordinance is specific to breed.

510 ILL. COMP. STAT. 5/24 (2015).

The plaintiffs point to *Village of Bridgeview* as support for their home-rule challenge, but that case is inapposite. At issue there was a dispute between Cook County and the Village of Bridgeview, a municipality within the county's borders. 8 N.E.3d at 1277–78. The two governmental units had promulgated conflicting regulations aimed at eradicating the problem of rabid feral cats. *Id*. To resolve the regulatory conflict, the state appellate court had to decide which governmental unit had a more traditional role and vital interest in controlling and preventing the spread of rabies.

The court held that rabies control is a matter of statewide concern and "do[es] not strictly pertain to the government and affairs of Bridgeview as a home rule unit." *Id.* at 1280. The court noted as well that the state and county governments had a "more traditional role" in addressing problems of rabies control. *Id.* Moreover, county government has a "greater geographical reach" and "can more comprehensively and effectively address feral cat control than local municipalities." *Id.* at 1279. In short, the *Kalodimos* factors all pointed in the same direction: the county ordinance prevailed over the village ordinance. *Id.* at 1280.

No similar regulatory conflict exists here. Illinois is not trying to regulate in this space, much less regulate exclusively. The puppy-mill ordinance does not exceed the City's home-rule authority under the Illinois Constitution.

## B. Dormant Commerce Clause

The Commerce Clause grants Congress the power to "regulate Commerce … among the several States," U.S. CONST. art. I, § 8, cl. 3, but the Supreme Court has long held that a "dormant" or "negative" component of the Clause implicitly limits the states from "erecting barriers to the free flow of interstate commerce" even where Congress hasn't acted, *see, e.g.*, *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 440 (1978). The doctrine is not generally applicable. It does not apply to *every* state and local law that affects interstate commerce. "Because even 'local' activities displace the movement of goods, services, funds, and people, almost every state and local law—indeed almost every private transaction—affects interstate commerce." *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1130 (7th Cir. 1995). Dormant Commerce Clause doctrine applies only to

laws that *discriminate* against interstate commerce, either expressly or in practical effect. *Id.* at 1130–31.

We have explained that state and local laws fall into one of three categories for purposes of dormant Commerce Clause analysis. "The first category comprises laws that explicitly discriminate against interstate commerce"; laws of this type are treated as presumptively unconstitutional. *Id.* at 1131. "The second category comprises laws that appear to be neutral among states but that bear more heavily on interstate commerce than on local commerce." *Id.* Facially nondiscriminatory laws sometimes have a discriminatory effect on interstate commerce, and "[w]hen the effect is powerful, acting as an embargo on interstate commerce without hindering intrastate sales," the law is treated as the equivalent of a facially discriminatory statute. *Id.*

On the other hand, laws that are facially nondiscriminatory but have "mild disparate effects and potential neutral justifications" are analyzed under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), which established a balancing test that requires the reviewing court to weigh the burden on interstate commerce against the nature and strength of the state or local interest at stake. *Nat'l Paint*, 45 F.3d at 1131. More specifically, *Pike* holds that when a state or local statute

> regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden

> that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

397 U.S. at 142 (citation omitted). Importantly for our purposes, however, *Pike* balancing is triggered *only* when the challenged law *discriminates* against interstate commerce in practical application. *Pike* is not the default standard of review for any state or local law that affects interstate commerce. *Nat'l Paint*, 45 F.3d at 1131.

"If the first category may be called disparate treatment, and the second disparate impact, the third category comprises laws that affect commerce without any reallocation among jurisdictions"—in other words, laws "that do not give local firms any competitive advantage over those located elsewhere." *Id.* In this third category, "the normal rational-basis standard is the governing rule." *Id.* "Unless the law discriminates against interstate commerce expressly or in practical effect, there is no reason to require special justification." *Id.* at 1132. To put the point in plainer terms: "No disparate treatment, no disparate impact, no problem under the dormant commerce clause."[1] *Id.*

---

[1] As Judge Hamilton reads the legal terrain, *National Paint* is no longer valid in light of intervening developments in dormant Commerce Clause doctrine—specifically, the Supreme Court's decisions in *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328 (2008), and *United Haulers Association v. Oneida–Herkimer Solid Waste Management Authority*, 550 U.S. 330 (2007). Dissent at p. 17. We disagree. We do not read the quoted passages of *Davis* and *United Haulers* as extending *Pike* balancing to *all* state laws—even those that have no discriminatory effect on interstate commerce. Read in context, the Court's references to "nondiscriminato-

The puppy-mill ordinance does not expressly discrimi-nate against interstate commerce. By limiting Chicago pet stores to dogs, cats, and rabbits sourced from public or private nonprofit shelters, the ordinance evenhandedly prohibits *all* large commercial breeders—whether located in Illinois or out of state—from selling dogs, cats, and rabbits to Chicago pet stores. Because there is no disparate treatment, the ordinance does not fall within the first category.

It does not fall within the second category either. The puppy-mill ordinance does not have a disparate impact on out-of-state breeders; breeders in Illinois enjoy no competi-tive advantage over their counterparts outside the state. All breeders are similarly disadvantaged. And unless the chal-lenged law discriminates against interstate commerce in practical effect, the dormant Commerce Clause does not come into play and *Pike* balancing does not apply.

The plaintiffs ask us to infer that Chicagoans will re-spond to the puppy-mill ordinance in part by turning direct-ly to breeders for their purebred pets. Indulging that infer-ence doesn't support a conclusion that the ordinance has a discriminatory effect on interstate commerce. While it's plausible to infer that Chicago consumers may prefer to patronize breeders located closer to the city over those that are farther away, that inference would show only that the ordinance may confer a competitive advantage on breeders that are not too distant from Chicago. But those breeders are as likely to be located in nearby Wisconsin or Indiana as they

---

ry" laws in these passages must be understood to mean *facially* nondis-criminatory laws that have discriminatory *practical effects* on interstate commerce—or in the *National Paint* taxonomy, state laws that have a *disparate impact* on interstate commerce.

are in suburban Chicago or downstate Illinois. So the supposition that Chicagoans will turn directly to breeders for their pure-bred pets does not establish that the ordinance has a discriminatory effect on breeders located out of state.

Perhaps Chicago consumers might respond to the ordinance by turning to small breeders rather than traveling to a large breeder outside Chicago (whether in state or out of state). But that would have the effect of simply shifting sales among different sources of pets without regard to location. "Favoritism for [small breeders over pet stores and large breeders] does not pose a constitutional problem … ." *Baude v. Heath*, 538 F.3d 608, 615 (7th Cir. 2008). Again, dormant Commerce Clause doctrine is concerned only with regulation that discriminates against out-of-state firms. *Nat'l Paint*, 45 F.3d at 1131–32; *Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.3d 496, 505 (7th Cir. 1989).

Perhaps Chicagoans might turn not to breeders (whether large or small, in state or out of state) but to pet stores in the surrounding suburbs or directly to the City's shelter or a shelter operated by a local private nonprofit. This just shifts business within the state; it has no effect on interstate commerce. *See Missouri Pet Breeders Ass'n v. County of Cook*, 106 F. Supp. 3d 908, 923 (N.D. Ill. 2015) ("[N]either of these outcomes imposes a burden on interstate commerce [because] business would simply shift between entities within Illinois." (citing *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 126 n.16 (1978))).

The plaintiffs argue that the puppy-mill ordinance is a de facto ban on pets bred out of state. It is not. Chicago has not attempted to regulate beyond its borders. The ordinance doesn't ban animals from out-of-state breeders, either ex-

pressly or in practical effect. It affects large breeders—
wherever they're located—in exactly the same way. Both can
sell directly to Chicago consumers, but they may not sell to
city-licensed pet retailers.

Finally, the plaintiffs maintain that dismissal on the
pleadings is improper because *Pike* balancing requires a
factual record. It's true as a general matter that "[a]ny bal-
ancing approach, of which *Pike* is an example, requires
evidence." *Baude*, 538 F.3d at 612. As we've explained,
however, *Pike* balancing is required *only* if the challenged
law has a discriminatory effect on interstate commerce. And
conclusory allegations of disparate impact are not sufficient;
to survive the City's motion to dismiss, the plaintiffs needed
to plead specific facts to support a plausible claim that the
ordinance has a discriminatory effect on interstate com-
merce. *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th
Cir. 2014). Because they haven't done so, *Pike* balancing is
not required. *See New York Pet Welfare Ass'n v. City of New
York*, 850 F.3d 79, 90–91 (2d Cir. 2017) (affirming a
Rule 12(b)(6) dismissal of an analogous challenge to a
puppy-mill ordinance).

Accordingly, the ordinance falls into the third category,
which comprises state and local laws that "affect commerce
without any reallocation among jurisdictions"; that is, laws
that "do not give local firms any competitive advantage over
those located elsewhere." *Nat'l Paint*, 45 F.3d at 1131. For
laws in this category, the default rational-basis standard of
review applies. *Id.* No surprise, the ordinance easily survives
review for rationality. Chicago's justifications for the ordi-
nance are plentiful and plausible. The City's policy goals are
to reduce financial support for mill breeders, curb the emo-

tional and financial burdens on consumers who unwittingly buy mill-bred pets, and reduce the cost of sheltering and euthanizing unwanted problem pets. These are unquestionably legitimate governmental interests, and it's rational to think that the puppy-mill ordinance will serve them.

Because the plaintiffs did not plead a plausible claim that the puppy-mill ordinance violates either the Illinois Constitution or the dormant Commerce Clause, the case was properly dismissed for failure to state a claim.

AFFIRMED.

HAMILTON, *Circuit Judge*, dissenting in part. I agree that the Illinois Constitution does not bar Chicago's ordinance. On two points critical to the federal Commerce Clause claim, however, I view the law differently than my colleagues do, so I respectfully dissent regarding the federal claim.

First, the Supreme Court itself has not yet confined the balancing test under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), as narrowly as my colleagues suggest. The majority writes that *Pike* balancing comes into play *"only* when the law *discriminates* against interstate commerce in practical application." Ante at 11 (emphasis in original), citing *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995). In *Pike* itself, however, the Court wrote that this balancing test applies where "the statute regulates *even-handedly* to effectuate a legitimate local public interest, and its effects on interstate commerce are *only incidental*...." 397 U.S. at 142 (emphasis added). In such cases, and this is one, the law will be upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.*

The majority tries to confine *Pike* balancing to cases of "discrimination," but it can do so only by using a notion of "discrimination" so broad that it applies to "even-handed" legislation with "only incidental" effects on interstate commerce. The majority would apply *Pike* only when the challenged law gives "local firms any competitive advantage over those located elsewhere." Ante at 11, quoting *National Paint*, 45 F.3d at 1131.

The Supreme Court's more recent discussions of *Pike*, since we decided *National Paint* in 1995, are difficult to reconcile with this approach. For example, the Court has explained that federal courts "generally leave the courtroom door open to

plaintiffs invoking the rule in *Pike*, that even *nondiscriminatory* burdens on commerce may be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice." *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 353 (2008) (emphasis added); see also *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007) (plurality opinion of Roberts, C.J.) ("Under the *Pike* test, we will uphold a *nondiscriminatory* statute like this one 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'") (emphasis added). Given these developments, we should no longer use *National Paint* to avoid *Pike* balancing in Commerce Clause cases like this one.

I confess that I write this with some diffidence and a sense of irony. *Pike* balancing has been criticized harshly in courts and the academy, and I am among those who have suggested it should ultimately be abandoned. See *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 95 (1987) (opinion of Scalia, J.) (*Pike* balancing inquiry is "ill suited to the judicial function and should be undertaken rarely if at all"); *Lebamoff Enterprises, Inc. v. Huskey*, 666 F.3d 455, 468–69 (7th Cir. 2012) (Hamilton, J., concurring in the judgment) (endorsing criticism); *Wiesmueller v. Kosobucki*, 571 F.3d 699, 704 (7th Cir. 2009) ("The judiciary lacks the time and the knowledge to be able to strike a fine balance between the burden that a particular state regulation lays on interstate commerce and the benefit of that regulation to the state's legitimate interests."); Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 Mich. L. Rev. 1091, 1207–08 (1986) (introducing review of Supreme Court cases); see also *Department of Revenue v. Davis*, 553 U.S. at 353–56 (describing

difficulty in applying *Pike* to state law exempting in-state government bonds from state income tax, and deferring to Congress to make policy choice). For now, though, the Supreme Court has left *Pike* open as a potential path to challenge economic regulations that do not discriminate against interstate commerce but that have incidental and perhaps unintended effects on interstate commerce.

Second, the majority errs by applying a stringent version of *Iqbal* and *Twombly* to find that plaintiffs have not plausibly alleged sufficiently burdensome effects on interstate commerce. Ante at 13–14, citing *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014) (applying stringent pleading standard to affirm dismissal of Title VII claim of disparate racial impact). Plaintiffs' complaint offers a plausible forecast of those effects, though. The operative complaint alleges that the ordinance prohibits out-of-state breeders from selling pets in Chicago except by direct sales to customers, who would have to visit the breeder to pick up the purchased pet or otherwise arrange for delivery. ¶ 72. Perhaps the effects would be like those for distant in-state breeders, but that would be an empirical question. The complaint also alleges that the ordinance will be counter-productive, depriving consumers of pure-bred puppies, depriving consumers of a regulated and accountable sources for such puppies, and leaving consumers with the only practical alternative of going to less regulated and less accountable brokers and breeders on the internet and elsewhere. ¶ 74.

Those allegations might or might not be true, but they seem to me at least plausible. It's easy to imagine that the Chicago ordinance will not actually reduce the demand for high-cost, pure-bred pets. Meeting that demand might well be

much more difficult and expensive, with greater effects on out-of-state breeders and without obvious gain in terms of health and safety or humane treatment of animals. In addition, plaintiffs offer at least some allegations of a discriminatory purpose, alleging that when the ordinance was enacted, the city clerk portrayed the ordinance as aligning Chicagoans against the interests of an out-of-state industry with its "powerbase in Iowa, Missouri and Indiana." ¶ 66 & Ex. B.

To affirm dismissal on the pleadings, the majority relies further on *National Paint*, but there we addressed factual findings made after a trial. We wrote: "*Pike* may be impossible to apply without some factual inquiries (albeit limited as *Clover Leaf Creamery* requires)." *National Paint*, 45 F.3d at 1132. Plaintiffs lost in *National Paint* because they had offered no evidence of impacts on interstate commerce. *Id.*; see also *id*. at 1134 (Rovner, J., concurring) (noting that district court may need to conduct evidentiary hearing or trial to test the actual benefits and burdens of legislation if there is an allegation of a disparate impact on interstate commerce); *Baude v. Heath*, 538 F.3d 608, 612 (7th Cir. 2008)(*Pike* "requires evidence"). I don't know whether the plaintiffs in this case could ultimately meet the demands of the *Pike* balancing test. They should be permitted to try, though, particularly now that the ordinance has taken effect and evidence of actual effects should be available. I would reverse the dismissal for failure to state a claim and remand for further proceedings.