*Restaurant Law Center v. City of New York*

# United States Court of Appeals
# For the Second Circuit

August Term 2022

Argued: May 18, 2022
Decided: January 5, 2024

No. 22-491-cv

RESTAURANT LAW CENTER, NEW YORK STATE RESTAURANT ASSOCIATION,

*Plaintiffs-Appellants,*

*v.*

CITY OF NEW YORK, VILDA VERA MAYUGA, IN HER OFFICIAL CAPACITY AS
COMMISSIONER OF THE NEW YORK CITY DEPARTMENT OF CONSUMER AND WORKER
PROTECTION,

*Defendants-Appellees.*[*]

Appeal from the United States District Court
for the Southern District of New York
No. 21-cv-4801, Denise Cote, *Judge.*

---

[*] The Clerk of Court is respectfully directed to amend the caption accordingly.

Before:     PARKER AND NATHAN, *Circuit Judges*.[*]

Plaintiffs, a public policy organization and food service trade association, brought this action under 42 U.S.C. § 1983 against the City of New York and the Commissioner of the City's Department of Consumer and Worker Protection, alleging that New York City's law prohibiting the wrongful discharge of fast-food restaurant employees is preempted by federal law and violates the dormant Commerce Clause of the United States Constitution. The United States District Court for the Southern District of New York (Cote, *J.*) granted defendants' motions for summary judgment. We conclude that the City's Wrongful Discharge Law does not violate federal law nor the United States Constitution. Accordingly, we **AFFIRM**.

————

WILLIAM R. PETERSON (Leni D. Battaglia, James D. Nelson, *on the brief*), Morgan, Lewis & Bockius LLP, Houston, TX, *for Plaintiffs-Appellants*.

ANGELO I. AMADOR, Restaurant Law Center, Washington, D.C., *for Plaintiffs-Appellants*.

ELINA DRUKER (Richard Dearing, Claude S. Platton, *on the brief*), *for* Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, New York, N.Y., for Defendants-Appellees.

BARBARA D. UNDERWOOD, Solicitor General (Ester Murdukhayeva, Deputy Solicitor General & Stephen J. Yanni, Assistant Solicitor General, *on the brief*) *for* Letitia

---

[*] Judge Rosemary S. Pooler, originally a member of the panel, passed away on August 10, 2023. The two remaining members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b); *United States v. Desimone*, 140 F.3d 457, 458–59 (2d Cir. 1998).

James, Attorney General of the State of New York, New York, N.Y., *for Amici Curiae* States of New York, California, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Mexico, Oregon, Pennsylvania, Rhode Island, and Washington, and the District of Columbia in support of Defendants-Appellees.

————

NATHAN, *Circuit Judge*:

In December 2020, the New York City Council amended the City's Fair Workweek Law to provide additional employment protections for workers in the fast-food industry. Specifically, the amendments enacted the Wrongful Discharge Law, which protects employees of large fast-food chains in New York City from arbitrary terminations and reductions in hours. The Law also provides those fast-food employees with the option to arbitrate claims of alleged violations. The Wrongful Discharge Law took effect on July 4, 2021. N.Y.C. Admin. Code §§ 20-1271-75.

This case arose when Plaintiffs, the Restaurant Law Center and the New York State Restaurant Association, challenged the Wrongful Discharge Law on grounds that it is preempted by the National Labor Relations Act (NLRA) and

unconstitutional under the dormant Commerce Clause. We conclude that the Wrongful Discharge Law is neither preempted nor unconstitutional.

First, we hold that New York's Wrongful Discharge Law is not preempted by the NLRA because it establishes minimum labor standards that regulate the substance, rather than the process, of labor negotiations. When Congress enacted the NLRA, it sought to safeguard the "right of employees to organize and bargain collectively" to address "[t]he inequality of bargaining power" between employees and employers. 29 U.S.C. § 151. Within the NLRA, the Supreme Court has interpreted an implicit limit on state and local interference in the collective bargaining process, which it calls *Machinists* preemption. The precedents of the Supreme Court and this circuit confirm, however, that *Machinists* preemption leaves undisturbed states' broad police powers to regulate substantive labor standards, which serve as the backdrop for the employment negotiations governed by federal law. For example, states regularly set minimum wage requirements even though wages are a quintessentially bargained for employment condition. That is because laws establishing substantive labor standards are

4

compatible with the NLRA's animating purpose to establish an equitable process for determining the terms of conditions of employment.

New York's Wrongful Discharge Law is one such law. It does not regulate the process of collective bargaining. Instead, the Law provides minimum protections to individual workers. These protections include safeguards against arbitrary terminations and reductions in hours absent misconduct or a bona fide economic reason, and protection for redressing employer violations through arbitration. All employees of covered entities in New York City benefit from these protections, whether they are unionized or not. And all covered employers must adhere to the Law's requirements, whether they employ unionized workers or not. In short, New York's Wrongful Discharge Law validly enacts a minimum labor standard that is compatible with the NLRA's purpose to restore the equality of bargaining power.

Second, we hold that New York's Wrongful Discharge Law does not violate the dormant Commerce Clause. The dormant Commerce Clause acts as a constitutional safeguard against economic protectionism, subjecting regulatory

5

measures designed to benefit in-state economic interests by burdening out-of-state competitors to heightened scrutiny. But the Wrongful Discharge Law is not a protectionist regulatory measure. The Law, which applies to all fast-food chains (whether they are headquartered within New York or without) that have at least thirty or more locations (whether in New York or not), plainly does not facially discriminate against interstate commerce. Nor does it harbor a discriminatory purpose.

Instead, Plaintiffs argue that the Wrongful Discharge Law discriminates against interstate commerce in practical effect because there are no solely intrastate fast-food chains in New York City with more than 30 locations. But that alone does not make a constitutional violation. The dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127–28 (1978). To succeed, Plaintiffs must show that the Wrongful Discharge Law confers a competitive advantage upon local businesses at the expense of out-of-state competitors. But they cannot. The Law does not impose direct costs on out-

6

of-state franchisors or any other out-of-state entity—only individual restaurants operating in New York City if they are part of a large chain. Any direct burdens imposed by the Law are thus highly localized, and any burdens on interstate commerce are merely incidental.

Because the Wrongful Discharge Law does not discriminate against interstate commerce, it escapes heightened scrutiny and is subject to a more permissive balancing test under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). The Law easily passes muster under this test. We will uphold a law under *Pike* unless the incidental burdens it imposes on interstate commerce are "clearly excessive" in relation to its local benefits. Here, the City has identified an array of local benefits associated with the Wrongful Discharge Law that clearly overcome any incidental burdens. After compiling ample legislative findings concerning substandard working conditions in the fast-food industry, the City enacted the Law to protect vulnerable fast-food employees from the financial hardships caused by arbitrary reductions in hours and terminations. These hardships include food insecurity, the loss of resources to pay for childcare, and

homelessness. Weighed against the hypothetical compliance costs carried by interstate fast-food businesses that implement the requisite discharge policies in New York City, we conclude that the Wrongful Discharge Law survives under *Pike*. The Law therefore does not violate the dormant Commerce Clause.

Accordingly, we **AFFIRM** the judgment of the district court.

## BACKGROUND

### I. Factual Background[2]

In 2017, New York City enacted the Fair Workweek Law to provide wage and hour protections for employees in the fast-food industry. N.Y.C. Admin. Code §§ 20-1201-63. The Fair Workweek Law defines fast-food establishments as those 1) whose "primary purpose" is to serve food or drinks that are paid for before eating, 2) which offer "limited service," and 3) which are part of a chain of thirty or more establishments measured nationally. *Id*. § 20-1201. This definition was adopted from the 2015 New York State Department of Labor regulations that

---

[2] The factual allegations are taken from Plaintiffs' complaint and any incorporated documents, and they are assumed to be true at this stage. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012).

raised the minimum wage for fast-food employees, N.Y. Comp. Codes R. & Regs. tit. 12, § 146.3-13, and covers chains that are wholly intrastate and those with out-of-state locations. *See* N.Y.S. Dep't of Labor, *Minimum Wage for Fast Food Workers Frequently Asked Questions*, https://dol.ny.gov/minimum-wage-fast-food-workers-frequently-asked-questions [https://perma.cc/2A5Y-E3SU] ("There is no requirement that the chain have locations outside of New York State.").

In December 2020, the City Council amended the Fair Workweek Law, enacting the Wrongful Discharge Law (the Law), which took effect on July 4, 2021. N.Y.C. Admin. Code §§ 20-1271-75. The Law prohibits employers governed by the Fair Workweek Law from firing hourly wage employees without notice or reason in the absence of egregious misconduct and provides those employees with the option to arbitrate claims of alleged violations of the Law. Two provisions of the Law are at issue in this litigation: the Just Cause Provision and the Arbitration Provision.

## A.      The Just Cause Provision

The Just Cause Provision provides that a "fast food employer shall not discharge a fast food employee who has completed such employer's probation period except for just cause or for a bona fide economic reason." N.Y.C. Admin. Code § 20-1272(a). A discharge is "any cessation of employment, including layoff, termination, constructive discharge, reduction in hours and indefinite suspension." *Id*. § 20-1271. A reduction in hours denotes "a reduction in a fast food employee's hours of work totaling at least 15 percent of the employee's regular schedule or 15 percent of any weekly work schedule." *Id*. "Just cause" is defined as "the fast food employee's failure to satisfactorily perform job duties or misconduct that is demonstrably and materially harmful to the fast food employer's legitimate business interests." *Id*. In determining whether an employee was discharged for just cause, a fact finder must consider five factors

enumerated in the Law, including an employer's use of a progressive discipline policy. *See id*. § 20-1272(b), (c).

The employer must supply the former employee with a written explanation containing "the precise reasons for their discharge" within five days of the discharge. *Id*. § 20-1272(d). There is an exception to the just-cause requirement if a fast-food employer has a "bona fide economic reason" to lay off employees or reduce employees' hours by more than fifteen percent. *Id*. §§ 20-1272(a), 20-1271. To establish this exception, an employer must show through business records that operational changes are "in response to a reduction in volume of production, sales, or profit." *Id*. §§ 1272(g), 20-1271.

## B.      The Arbitration Provision

New York's Fair Workweek Law previously provided for two enforcement mechanisms: an employee could either file an administrative complaint with the New York City Department of Consumer and Worker Protection, *id*. § 20-1207, or the employee could bring a private action in court, *id*. § 20-1211. The Wrongful Discharge Law's Arbitration Provision adds a third option, providing that "any

11

person or organization representing persons alleging a violation" of the Law may initiate an arbitration proceeding. *Id*. § 20-1273(a). Once an employee selects arbitration to pursue a claim, it becomes the exclusive remedy for the dispute, barring a private cause of action or administrative complaint unless the "arbitration proceeding has been withdrawn or dismissed without prejudice." *Id*. § 20-1273(i). An employee who prevails at arbitration is entitled to attorneys' fees and costs, reinstatement or restoration of hours, and "all other appropriate equitable relief," including "such other compensatory damages or injunctive relief as may be appropriate." *Id*. § 20-1273(a). Additionally, either party can petition for judicial review of the outcome of the arbitration proceeding. *Id*. § 20-1273(j).

## II. Procedural History

Plaintiff Restaurant Law Center is a public policy organization affiliated with the National Restaurant Association, a food service trade association that provides industry-specific guidance for owners and operators. Plaintiff New York State Restaurant Association is a not-for-profit hospitality association with over 10,000 food service members in the State.

12

Restaurant Law Center and the New York State Restaurant Association (together, Plaintiffs) filed suit on May 28, 2021 in the United States District Court for the Southern District of New York (Cote, *J.*), seeking declaratory and injunctive relief to enjoin enforcement of the Law before it took effect. The complaint alleges that the Law is preempted by the NLRA and the Federal Arbitration Act (FAA) and violates the dormant Commerce Clause, the New York State Constitution, and state law.

The parties cross-moved for summary judgment and, on February 10, 2022, the district court granted the City's motion on Plaintiffs' federal claims and declined to exercise supplemental jurisdiction over Plaintiffs' state law claims. *See Restaurant L. Ctr. v. City of New York*, 585 F. Supp. 3d 366, 372 (S.D.N.Y. 2022). As a preliminary matter, the district court concluded that the New York State Restaurant Association had standing to pursue its federal claims, as it alleged that it had diverted resources to inform its members about the Law and its compliance requirements. Because the presence of one party with standing "is sufficient" to satisfy Article III's case-or-controversy requirement, the district court ended its

13

standing analysis there. *Id.* at 375 (quoting *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017)).

On the merits, the district court first determined that the NLRA does not preempt the Wrongful Discharge Law because it is a "validly enacted minimum labor standard." *Restaurant L. Ctr.*, 585 F. Supp. 3d at 377. In a careful and thoughtful opinion, the district court reasoned that, under the NLRA, states retain authority to regulate substantive labor standards; the Law does not prevent covered employers from engaging in lockouts; and unions are not favored by the provision, as both unionized and non-unionized employers are affected by the Law alike. *Id.* at 377–78. Second, the district court concluded that the Law does not violate the dormant Commerce Clause, reasoning that "the Law does not benefit in-state restaurant chains 'at the expense of out-of-state competitors'" because "[o]nly those establishments operating within the City are impacted by the Law." *Id.* at 380 (quoting *Grand Rivers Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005)). Given that the Law is "a general welfare statute," the

14

district court concluded that it easily passes muster under the balancing test from

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Id.* at 381.

Finally, the district court rejected Plaintiffs' claim that the Law's arbitration

provision is preempted by the FAA on grounds that the provision does not

prohibit the enforcement of private arbitration agreements. *Id.* at 382. Having

granted summary judgment on all federal claims, the court then declined to

exercise supplemental jurisdiction over Plaintiffs' state law claims. *Id.* at 382–83.[3]

## DISCUSSION

Plaintiffs now ask this Court to determine whether the Wrongful Discharge

Law is preempted by the NLRA, or violates the dormant Commerce Clause. We

review the district court's dismissal of Plaintiffs' claims *de novo*. *Jones v. Cnty. of*

*Suffolk*, 936 F.3d 108, 114 (2d Cir. 2019). A grant of summary judgment will only

be affirmed where "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*

---

[3] On appeal, Plaintiffs have abandoned their prior arguments that the Law is preempted by the FAA and violates state law.

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011). For the reasons below, we conclude that the Wrongful Discharge Law neither is preempted by the NLRA nor violates the dormant Commerce Clause. We therefore affirm the judgment of the district court.

## I. NLRA Preemption

We begin with Plaintiffs' claim that New York's Wrongful Discharge Law is preempted by the NLRA. The NLRA declares that it is the policy of the United States to eliminate obstructions of commerce "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151. It enacts Congress's determination that safeguarding the "right of employees to organize

16

and bargain collectively" is necessary to address "[t]he inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association." *Id.*

The NLRA does not include an express preemption provision. And "[t]he mere existence of the NLRA does not indicate a congressional intent to usurp the entire field of labor-management relations." *Figueroa v. Foster*, 864 F.3d 222, 229 (2d Cir. 2017) (Pooler, J.) (cleaned up) (quoting *Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Local 54*, 468 U.S. 491, 501 (1984)). Rather, "[t]he doctrine of labor law preemption concerns the extent to which Congress has placed *implicit* limits on the permissible scope of state regulation of activity touching upon labor-management relations." *N.Y. Tel. Co. v. N.Y. Dep't of Labor*, 440 U.S. 519, 527 (1979) (emphasis added) (internal quotation marks omitted) (quoting *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 187 (1978)).

One such implicit limit "forbids states and localities from intruding upon the labor-management bargaining process." *Concerned Home Care Providers, Inc. v.*

*Cuomo*, 783 F.3d 77, 84 (2d Cir. 2015) (cleaned up) [hereinafter, *Concerned Home*].

When Congress enacted the NLRA, it established "a framework for self-organization and collective bargaining." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 751 (1985). Sections 7 and 8 of the NLRA, for instance, protect employees' rights to organize, engage in protected collective bargaining, and other collective activities to identify unfair labor practices. 29 U.S.C. §§ 157, 158(a)–(b). By enacting this framework, "Congress determined both how much the conduct of unions and employers should be regulated, and how much it should be left unregulated." *Metro. Life Ins. Co.*, 471 U.S. at 751. Implicit in Congress's statutory design, then, is a limit on "state law and state causes of action . . . concerning activity that was neither arguably protected against employer interference by §§ 7 and 8(a)(1) of the NLRA, nor arguably prohibited as an unfair labor practice by § 8(b) of that Act." *Id*. at 749. This implicit limit is called *Machinists* preemption. *See Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976).

Plaintiffs contend that the Wrongful Discharge law is preempted under the *Machinists* doctrine. We disagree. In several cases, the Supreme Court has

18

established that *Machinists* does not bar state and local governments from enacting laws that provide substantive employment protections. More precisely, the Court has, on three occasions, entertained and rejected *Machinists* preemption challenges to "state rules of general application that affect" but do not indirectly regulate "the right to bargain or to self-organization." *See Metro. Life Ins. Co.*, 471 U.S. at 749 & n.27. New York's Wrongful Discharge Law is such a rule.

Start with *New York Tel. Co. v. New York State Dept. of Lab.*, 440 U.S. 519 (1979). There, the Supreme Court rejected a *Machinists* challenge to a New York law providing unemployment compensation to striking workers. It explained that *Machinists* preemption is not triggered just because "the class benefited [by the law] is primarily made up of employees in the State and the class providing the benefits is primarily made up of employers in the State," or even when "some of the members of each class are occasionally engaged in labor disputes." *Id*. at 532–33. So long as "the general purport of the program is not to regulate the bargaining relationships between the two classes but instead to provide an efficient means of

19

insuring employment security in the State," *Machinists* preemption is inapplicable. *Id*. at 533.

Nor is *Machinists* preemption applicable whenever a law regulates in an area that would otherwise be subject to collective bargaining. The Supreme Court said as much in *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724 (1985), when it upheld a Massachusetts law requiring employers to provide mental health benefits in employee health-care plans. Challengers in *Metropolitan Life* reasoned that because the "NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment," "[a] law that interferes with the end result of bargaining . . . is even worse than a law that interferes with the bargaining process." *Id*. at 752–53. Not so. The Court rejected this argument and explained that "the purpose and operation" of the NLRA is to remedy the "inequality of bargaining power between employees" on the one hand, "who do not possess full freedom of association or actual liberty of contract, and employers" on the other, "who are organized in the corporate or other forms of ownership association." *Id*. (quoting 29 U.S.C. § 151). But "[n]either inequality of

20

bargaining power nor the resultant depressed wage rates were thought" by Congress "to result from the choice between having the terms of employment set by public law or having them set by private agreement." *Id.* at 754. The Court concluded, therefore, that "[n]o incompatibility exists . . . between federal rules designed to restore the equality of bargaining power"—that is, the NLRA—"and state . . . legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements." *Id.* In short, by enacting the NLRA, Congress left in place police powers granting states "broad authority . . . to regulate the employment relationship to protect workers . . . ." *Id*. at 756.

The Supreme Court drove this point home two years later in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987), when it rejected a *Machinists* challenge to a Maine law requiring employers to provide severance payments to employees in the event of plant closures. Just like the Massachusetts benefits law in *Metropolitan Life*, the Court concluded that the Maine law "provides protections to individual union and nonunion workers alike, and thus neither encourages nor discourages the collective-bargaining processes that are the subject of the NLRA." *Id*. at 20–21

21

(cleaned up). And the Court again acknowledged that "[b]oth employers and employees come to the bargaining table with rights under state law that form a 'backdrop' for their negotiations." *Id.* at 21 (quoting *Metro. Life Ins. Co.*, 471 U.S. at 757). "Thus, the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim to pre-emption, for there is nothing in the NLRA . . . which expressly forecloses all state regulatory power with respect to those issues . . . that may be the subject of collective bargaining." *Id*. at 21–22 (cleaned up). To hold otherwise would threaten preemption of "any state law that substantively regulates employment conditions." *Id*. at 21. But given the traditional police power of the states, the Court cautioned that "pre-emption should not be lightly inferred in this area." *Id*.

Following these precedents, the Second Circuit has never applied *Machinists* to invalidate a law regulating the *substance*, rather than the *process*, of labor negotiations. In *Concerned Home Care Providers, Inc. v. Cuomo*, our primary case on the topic, we stated that minimum labor standards guaranteed by state law "do[] not limit the rights of self-organization or collective bargaining protected by the

NLRA" and are therefore not preempted. 783 F.3d at 86 (quoting *Metro. Life Ins. Co.*, 471 U.S. at 758). The law at issue in *Concerned Home* was New York's Wage Parity Law, which fixed minimum rates of compensation for home healthcare aides working in New York City and surrounding counties by looking, in part, to collective-bargaining agreements governing wages paid to home aides in the relevant areas. *Id.* at 82–87. We determined that the Wage Parity Law was an "unexceptional exercise" of the State's traditional power to stabilize minimum wages in a particular industry. *Id.* at 85. It "neither distinguishe[d] between unionized and non-unionized aides, nor treat[ed] employers differently based on whether they employ unionized workers." *Id.* We concluded that the law was therefore compatible with the purposes of the NLRA because it "is not designed to encourage or discourage employees in the promotion of their interests collectively," and "does not favor or disfavor collective bargaining, eliminate

23

particular bargaining tools, or dictate the details of particular contract negotiations." *Id.* at 85–86 (internal quotation marks and quotation omitted).[4]

To summarize, the NLRA leaves intact states' broad authority under their police powers to regulate substantive labor standards, which serve as the backdrop for the employment negotiations governed by federal law. That is because "[t]he NLRA is concerned primarily with establishing an equitable *process* for determining terms and conditions of employment . . . ." *Metro. Life Ins. Co.*, 471 U.S. at 753–54 (emphasis added). So, "[n]o incompatibility exists . . . between [the NLRA] . . . and state or federal legislation that imposes minimal *substantive* requirements on contract terms negotiated between parties to labor agreements." *Id*. (emphasis added).

---

[4] *See also Rondout Elec., Inc. v. NYS Dept. of Labor*, 335 F.3d 162 (2d Cir. 2003) (rejecting a *Machinists* preemption challenge to a law requiring public works contractors to pay their employees a prevailing wage and cover a variety of benefits including health, welfare, disability, retirement, life and disability, and vacation, in part because the law was a minimum labor standard); *Ass'n of Car Wash Owners, Inc. v. City of New York*, 911 F.3d 74 (2d Cir. 2018) (rejecting a *Machinists* challenge to a New York law that set a lower surety bond requirement to operate a car wash if the employer was a party to a collective-bargaining agreement).

Minimum labor standards permitted by *Machinists* are regulations that mandate benefits that "affect union and nonunion employees equally," "neither encourage nor discourage the collective-bargaining processes," and "have [only] the most indirect effect on the right of self-organization . . . ." *Metro. Life Ins. Co.*, 471 U.S. at 755. In short, this Court—and the Supreme Court—have made clear that minimum labor standards dictating specific terms of employment are not preempted under *Machinists* provided they do not put a thumb on the scale of either labor or management in the bargaining process. *See Rondout Elec., Inc.*, 335 F.3d at 167.

To restate the doctrine is effectively to resolve this case. New York's Wrongful Discharge Law validly enacts a minimum labor standard. It does not regulate the *process* of collective bargaining. Instead, the Law provides "specific minimum protections to individual workers," *Metro. Life Ins. Co.*, 471 U.S. at 755 (quoting *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 739 (1981) (emphasis omitted)), and is therefore "not incompatible" with the "general goals of the NLRA." *Id.* These minimum protections include substantive safeguards

25

against arbitrary terminations and reductions in hours absent misconduct or a bona fide economic reason, and protections for redressing employer violations through arbitration. "Unlike the NLRA, the Law is not designed to encourage or discourage employees in the promotion of their interests collectively." *Concerned Home*, 783 F.3d at 85 (cleaned up). All employees of covered entities in New York City benefit from the Law's protections—"it neither distinguishes between unionized and non-unionized [fast-food employees], nor treats employers differently based on whether they employ unionized workers." *Id.*

The sum and substance of Plaintiffs' position is that New York's law is too detailed, too specific, too novel, and too intrusive on labor-management relations to constitute a *minimum* labor standard. But from start to finish, Plaintiffs' analysis fails. It does not fit the statute; it is not faithful to our precedent; and it fails to serve the purpose both Congress and the Court have understood to animate the NLRA.

Plaintiffs first attack the Law for removing issues "from the realm of bargaining" by providing too many protections to employees and thus effectively

26

"impos[ing] typical [collective-bargaining agreement] terms on Targeted Fast-Food Employers." Appellants' Br. at 22–23. A law this "invasive and detailed," Plaintiffs argue, cannot be a minimum labor standard. *Id.* at 24. However, as discussed, the Supreme Court has squarely rejected this argument in *Fort Halifax*, noting that "any state law that substantively regulates employment conditions" could be said to "give[] employees something for which they otherwise might have to bargain." *Fort Halifax*, 482 U.S. at 21. The mere fact that "a state statute pertains to matters over which the parties are free to bargain cannot support a claim to pre-emption, for there is nothing in the NLRA which expressly forecloses all state regulatory power with respect to those issues that may be the subject of collective bargaining." *See id.* at 21-22 (cleaned up).

We similarly disapproved of Plaintiffs' exact argument several years ago in *Concerned Home.* Upholding New York's Wage Parity Law as a minimum labor standard, we remarked that the law "may affect the package of benefits over which employers and employees can negotiate," but it did "not limit the rights of self-organization or collective bargaining protected by the NLRA . . . ." *Concerned*

27

*Home*, 783 F.3d at 86 (quotation omitted).  In rejecting the challenge, we warned that "*Machinists* preemption is not a license for courts to close political routes to workplace protections simply because those protections may also be the subject of collective bargaining."  *Id.* at 87.  Contrary to precedent, that is how Plaintiffs today ask us to treat *Machinists* preemption.

Plaintiffs next argue that New York's Law cannot be considered a minimum labor standard because it specifically targets fast-food employers with thirty or more locations nationwide.  *See* Appellants' Br. at 35.  But the fact that a statute targets a particular subset of an industry does not, on its own, mean that the statute does not set a minimum labor standard.  *Concerned Home* again rejected this exact argument—and for good reason.  Petitioners there argued that the Wage Parity Law could not be a minimum labor standard because it applied only to home health care aides in New York City and surrounding counties.  *See Concerned Home*, 783 F.3d at 86.  We rejected that premise, as "*Machinists* preemption does not . . . eliminate state authority to craft minimum labor standards for particular regions or areas of the labor market."  *See id.*  The same logic applies here.  The City enacted

28

the Wrongful Discharge Law based on extensive legislative findings that fast-food employers in the City engaged in rampant and arbitrary firings and drastic reductions of employees' hours. Consistent with *Concerned Home*, the City was entitled to craft targeted legislation establishing minimum labor standards in that particular industry.

Plaintiffs mistakenly rely on one line of dicta in *Concerned Home*, in which we "assum[ed], *arguendo*, that there may be labor standards that are so finely targeted that they impermissibly intrude upon the collective-bargaining process . . . ." *Id.* The Wrongful Discharge Law, which simply "provid[es] basic protections" for fast food employees and sets "a floor," is no such law. App'x at 224. At the end of the day, the Supreme Court "has never applied *Machinists* preemption to a state law that does not regulate the mechanics of labor dispute resolution." *Concerned Home*, 783 F.3d at 86. There is no reason to do so here.

To supplement these arguments, Plaintiffs turn to decisions from the Ninth and Seventh Circuits: *Chamber of Commerce v. Bragdon*, 64 F.3d 497 (9th Cir. 1995) and *520 South Michigan Avenue Assocs., Ltd. v. Shannon*, 549 F.3d 1119 (7th Cir.

2008). Neither case alters our conclusion. Our Court refused to adopt the reasoning of these decisions in *Concerned Home*, declining to opine on whether "these cases were correctly decided." 783 F.3d at 86 n.8; *see also Rondout*, 335 F.3d at 169 ("Having distinguished *Bragdon*, we have no need to decide whether *Bragdon* was correctly decided on its own facts."). Instead, the Court found these out-of-circuit cases readily distinguishable on the facts from the Wage Parity Law. We take the same approach here.

The ordinance in *Bragdon* posed an "interference with the collective-bargaining process," *Concerned Home*, 783 F.3d at 86 n.8, because it set prevailing wages for specific private construction projects using formulas that averaged "wages and benefits for each craft pursuant to collective-bargaining agreements applicable in each labor market," *Bragdon*, 64 F.3d at 502; *see also Am. Hotel & Lodging Ass'n v. City of L.A.*, 834 F.3d 958, 965 n.5 (9th Cir. 2016) (observing that the law in *Bragdon* was preempted because it "effectively forc[ed] nonunion

employers to pay what amounted to a union wage").[5] In other words, it tied wages dynamically to ongoing and future bargaining processes. The Seventh Circuit then relied on *Bragdon* in *Shannon* to hold that an Illinois statute governing rest breaks and meal periods for hotel attendants in Cook County was preempted because it directly interfered with an existing and ongoing labor dispute between the hotel attendants and their employers. *See Shannon*, 549 F.3d at 1121, 1133–35. The state was intervening in an ongoing contract negotiation between the union and a group of hotels by passing legislation that required terms the union could not secure during an active strike. *See id.* at 1132–34, 1133 n.11.

Even assuming, *arguendo*, that *Shannon* and *Bragdon* were correctly decided, neither is persuasive here, as the Law is conspicuously dissimilar from the invalidated laws in those cases. Unlike in *Shannon*, there is no active, ongoing labor dispute in which the Law directly intervenes. And unlike the ordinance in *Bragdon*, the substantive terms required by the Law do not oscillate depending on

---

[5] Since *Bragdon*, the Ninth Circuit has clarified that minimum labor standards "are not invalid simply because they apply to particular trades, professions, or job classifications rather than to the entire labor market." *Associated Builders & Contractors of S. Cal., Inc. v. Nunn*, 356 F.3d 979, 990 (9th Cir. 2004), *amended by* 2004 WL 292128 (9th Cir. Feb. 17, 2004).

the results of ongoing or future collective bargaining. Indeed, the labor standards imposed by the Wrongful Discharge Law have no relation whatsoever to the bargained-for terms of any collective-bargaining agreement.

Lastly, Plaintiffs contend that the Law cannot qualify as a minimum labor standard because its regulation of discharges is unprecedented in its comprehensive scope. As a factual matter, that is not true. The Law closely tracks with other state and local ordinances that impose just-cause protections and have been upheld by our sister circuits. *See, e.g.*, *St. Thomas-St. John Hotel & Tourism Ass'n*, 218 F.3d 232, 244 (3d Cir. 2000) (rejecting an NLRA preemption challenge to the Virgin Islands Wrongful Discharge Act because it "neither regulates the process of bargaining nor upsets the balance of power of management on one side and labor on the other"); *see also R.I. Hosp. Ass'n v. City of Providence ex rel. Lombardi*, 667 F.3d 17, 23–24 (1st Cir. 2011) (upholding the City of Providence's Ordinance 467, which required retention of certain employees for at least three months upon change in hotel ownership, as a minimum labor standard); *Wash. Serv. Contractors Coal. v. District of Columbia*, 54 F.3d 811, 813 (D.C. Cir. 1995) (upholding local

32

regulation that required contractors who take over contracts to retain their predecessors' employees for ninety days).  New York City's Law providing just-cause protection to fast-food employees is no more comprehensive than these other wrongful discharge statutes, which have all survived NLRA preemption challenges.

New York's Wrongful Discharge Law is also analogous to the numerous statutory measures enacted over the past century limiting employers' ability to discharge their workers.  *See, e.g.*, 29 U.S.C. § 215(a)(3) (Fair Labor Standards Act of 1938); 33 U.S.C. § 1367(a) (Federal Water Pollution Control Act of 1948); 42 U.S.C. § 2000e-2 (Title VII of the Civil Rights Act of 1964); *see also* Brief for Professors of Lab. L. as Amici Curiae Supporting Defendants-Appellees at 18–20 (collecting laws "erod[ing] the doctrine [of at-will employment] over time with numerous . . . limitations on employers' ability to terminate employees, many of which impose detailed requirements on employers").

Even assuming the Laws are "unprecedented," "exceptional and novel," Plaintiffs fail to explain why a labor regulation's novelty is at all germane to our

*Machinists* preemption analysis. To be sure, minimum labor standards like the Wrongful Discharge Law are "unexceptional exercise[s]" of the state's "traditional" police powers. *See Concerned Home*, 783 F.3d at 85. But that does not mean those standards must themselves be *traditional* in a historical sense. When Congress enacted the NLRA, it did not freeze state and local labor law as it existed in 1935. To hold otherwise would be to ignore our Court's warning that "*Machinists* preemption is not a license for courts to close political routes to workplace protections." *Id*.

Recognizing that *Machinists* may only preempt laws that interfere in an ongoing collective-bargaining process, Plaintiffs argue that the Law does exactly that. But these attempts fail as roundly as the rest.

Plaintiffs contend, for instance, that the Law compels detailed conduct requirements that essentially impose a collective-bargaining agreement on non-unionized employers, including progressive discipline policies and mandatory arbitration at the employee's request. They refer to these features of the Law as "keystones of typical [collective-bargaining agreements]" and note that employees

34

usually obtain such provisions in exchange for a no-strike obligation and yet here, the employers do not receive the benefit of such a quid pro quo. Appellants' Br. at 32, 34. If the objection here is that the Law functionally imposes terms often found in collective-bargaining agreements on fast-food employers, we have already met this point head-on. As explained above, the mere fact that a labor protection "gives employees something for which they otherwise might have to bargain" and concomitantly requires employers to give up something else in the bargain does not trigger *Machinists* preemption. *Fort Halifax*, 482 U.S. at 21–22.

In any event, such provisions do not always go hand in hand, as some collective-bargaining agreements include just-cause or arbitration provisions and lack no-strike clauses. *See* Brief for Professors of Lab. L. as Amici Curiae Supporting Defendants-Appellees at 8 (citing Bloomberg Law, Collective Bargaining Negotiations & Contracts Manual §§ 80.01, 80.553, 94.01). The absence of a quid pro quo does not necessarily imply that unions receive preferential treatment, as Plaintiffs suggest. Employers of a unionized workforce are free to seek a no-strike obligation in existing or future collective-bargaining agreements

in exchange for different concessions. Indeed, nothing in the Law pressures employers to enter collective-bargaining agreements or encourage unionization, as it merely provides protections to employees that otherwise could have been addressed through collective bargaining. Nor does the Law distinguish between unionized and nonunionized workforces, or pressure employers to support unionization.

Plaintiffs also maintain that the Law's legislative record evinces the City Council's intent to enact the Service Employees International United's (SEIU) "wish list explicitly to aid unionization efforts." Appellant's Br. at 47. The district court, they argue, erred by ignoring this legislative history, which is an "important source [in the preemption context] for determining whether a particular statute was motivated by an impermissible motive" to "frustrate the operation of federal law." *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 419 (2d Cir. 2013). The City does not dispute SEIU's lobbying efforts to enact the Law. Nor would that be required, as the union's advocacy and involvement in the legislative process is irrelevant to our preemption analysis. So too would lobbying by

Restaurant Law or the Chamber of Commerce. A court's preemption inquiry "will not search for an impermissible motive where a permissible purpose is apparent, because federal preemption doctrine evaluates what legislation *does*, not why legislators voted for it or what political coalition led to its enactment." *Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 191 (2d Cir. 2012) (cleaned up). The Law here was enacted to protect vulnerable fast-food employees from rampant, unjust firings and reductions in hours. It was not passed to promote unionization. In any case, it is not entirely clear how a law that gives employees protections they might otherwise have to unionize to bargain for would encourage employees to unionize.

Finally, Plaintiffs assert that the Law invades the collective bargaining process by denying employers the use of lockouts as an "economic weapon[] of self-help" during labor disputes. Appellant's Br. at 40 (quotation marks omitted). Sometimes referred to as a temporary layoff, lockout occurs when an employer reduces an employee's hours as a means of pressuring the union to agree to the employer's bargaining demands. *See Am. Ship. Bldg. Co. v. N.L.R.B.*, 380 U.S. 300,

307–08 (1965). Plaintiffs argue that because the Law protects individual employees who are "discharged," and lockouts qualify as a form of discharge, the Law restricts the use of lockouts. We agree that application of the Just Cause Provision to restrict the use of lockouts may raise preemption problems. But this speculative claim is not enough to prevail on Plaintiffs' *facial* challenge to the Law.

First, Plaintiffs' construction of the Law here is strained in theory and unlikely to be adopted in practice. Neither the text nor the legislative history of the Just Cause Provision mentions lockouts. And that is not surprising because lockouts are a far cry from the typical layoff. Still more, Plaintiffs cannot show that their theory is remotely plausible in practice. Given that the fast-food industry is largely nonunionized, Plaintiffs cannot point to a single example of fast-food employers using lockouts during labor disputes. Nor do Plaintiffs marshal any support for the idea that a city agency would, in the face of federal NLRA regulation, enforce the statute to prohibit lockouts if such a hypothetical were to materialize.

38

In any event, whether or not the statute applies to lockouts is ultimately beside the point because Plaintiffs mount a facial challenge to the statute. And when plaintiffs bring a facial preemption challenge to a state law, they "must demonstrate that there is no possible set of conditions under which the challenged state [regime] could be constitutional." *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourse Comm'n*, 634 F.3d 206, 210 (2d Cir. 2011). Plaintiffs' lockout argument falls far short of that standard; it argues only that the application of New York's Wrongful Discharge Law to a specific factual situation would conflict with the NLRA. And as Defendants acknowledge, *see* Appellees' Br. at 33, in the unlikely event that the City enforces the Law's Just Cause Provision to lockouts, nothing would prohibit a successor from raising the preemption issue in a future as-applied challenge. *See Arizona v. United States*, 567 U.S. 387, 415 (2012).

The district court thus correctly decided that the NLRA does not preempt the Wrongful Discharge Law because it enacts a minimum labor standard and does not regulate the process of collective bargaining.

## II. Dormant Commerce Clause

The district court also concluded that the Wrongful Discharge Law does not violate the U.S. Constitution's dormant Commerce Clause. We agree.

The Commerce Clause of the U.S. Constitution vests Congress with the authority "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Within that clause, the Supreme Court has interpreted a negative implication known as the "dormant" Commerce Clause, intended to prevent "economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988).

However, the dormant Commerce Clause's scope is not "absolute." *Maine v. Taylor*, 477 U.S. 131, 138 (1986). States retain "broad power" to regulate their own affairs, even if they "bear adversely upon interstate commerce." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 531–32 (1949). And courts are not to wield the dormant Commerce Clause as "a roving license . . . to decide what activities are appropriate for state and local government to undertake." *Nat'l Pork Producers*

*Council v. Ross*, 143 S. Ct. 1142, 1159 (2023) (Gorsuch, J., plurality opinion) (quoting

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330,

343 (2007)).

Under the dormant Commerce Clause, a law that clearly discriminates

against interstate commerce is per se invalid unless the government has "no other

means to advance a legitimate local purpose." *United Haulers Ass'n*, 550 U.S. at

338–39. Discrimination "means differential treatment of in-state and out-of-state

economic interests that benefits the former and burdens the latter." *N.Y. Pet*

*Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 89 (2d Cir. 2017) (quotation

marks omitted). For a law to discriminate against interstate commerce, it can

either "discriminate on its face, harbor a discriminatory purpose, or discriminate

in its effect." *Id.* at 90. On the other hand, a non-discriminatory law that only

incidentally burdens interstate commerce is subject to a more permissive

balancing test under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), and will only be

"struck down if the burden imposed on interstate commerce clearly exceeds the

putative local gains." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007).

Where does New York's Wrongful Discharge law fit? The Law, which applies to all fast-food establishments (whether headquartered in New York or not) with at least thirty or more locations (whether in New York or not), plainly does not discriminate against interstate commerce on its face. Nor do Plaintiffs argue that the Law harbors a discriminatory purpose. Instead, the core of Plaintiffs' dormant Commerce Clause challenge is that the Law discriminates against interstate commerce in practical effect. Plaintiffs allege that there are no solely intrastate fast-food chains with more than 30 locations.[6] This is enough, in their view, to prove that the Law discriminates against interstate commerce. It is not.

The Court's dormant Commerce Clause jurisprudence has "eschewed formalism for a sensitive, case-by-case analysis of purposes and effects." *West*

---

[6] Plaintiffs support this claim with a declaration statement. *See* App'x 64 ("I am not aware of any intrastate restaurant chain that would be subject to the Just Cause Laws."). Whether this is true or not, we conclude that the Law does not discriminate against interstate commerce.

*Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994). In each case, the court must "determine whether the statute under attack . . . will in its practical operation work discrimination against interstate commerce." *Id.* For example, when a party alleges that a law discriminates against interstate commerce in practical effect, courts consider factors such as whether that law would "increase costs for a particular type of business model, create barriers to entry, raise labor costs in a way that will impact the flow of interstate commerce, cause franchisees to close or reduce operations, or generally affect interstate commerce." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 405 (9th Cir. 2015) (cleaned up); *see, e.g., Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 342 & n.4 (1992) (holding that an Alabama tax on out-of-state hazardous waste disposed of in-state discriminates against interstate commerce in practical effect because it "plainly discouraged the full operation of [plaintiff's in-state waste] facility," given that the total volume of waste buried at plaintiff's facility plummeted after the challenged law went into effect).

43

Even accepting Plaintiffs' claim that the Wrongful Discharge Law as a practical matter applies only to franchisees in New York City that are part of interstate restaurant chains, that fact on its own is not enough to establish that the Law discriminates against interstate commerce in practical effect. Indeed, to adopt Plaintiffs' dormant Commerce Clause theory would be to eschew a case-sensitive analysis for rigid formalism.

There is no dispute here that the Wrongful Discharge Law applies to fast-food establishments based on the size of the chain, not based on whether the establishment engages in interstate commerce. As discussed, the Law only applies to "fast food establishments," which it defines as chain restaurants that are "one of 30 or more establishments nationally." N.Y.C. Admin. Code § 20-1201. The Law draws no distinction between national fast-food chains and chains with more than thirty locations that are solely located within New York. Conversely, the Law exempts businesses with fewer than thirty locations even if they are interstate in nature. New York has thus adopted a neutral metric to describe the scale of the enterprise that must comply with the Law—one derived from the City's Fair

44

Workweek Law, which the Wrongful Discharge Law amended.[7]  *Id.*  And focusing

on chain size is plainly not illogical given that franchisees of larger chains are in a

better position to absorb compliance costs associated with implementation.

That New York's Law applies most often to large interstate chains does not,

on its own, establish a dormant Commerce Clause violation.  At the outset,

Plaintiffs' argument is foreclosed by precedent.  In *Exxon Corp. v. Governor of*

*Maryland*, the Supreme Court held that "[t]he fact that the burden of a state

regulation falls on some interstate companies does not, by itself, establish a claim

of discrimination against interstate commerce."  437 U.S. 117, 126 (1978); *see also*

*N.Y. Pet Welfare Ass'n*, 850 F.3d at 91 ("The Supreme Court has considered and

rejected the argument that a statute is discriminatory because it will apply most

---

[7] The Third Department of the New York State Supreme Court, Appellate Division, has previously rejected a dormant Commerce Clause challenge to this exact metric in *National Restaurant Ass'n v. Commissioner of Labor*, 34 N.Y.S.3d 232, 239–40 (3d Dept. 2016).  There, plaintiff brought a dormant Commerce Clause challenge to New York's Fast Food Wage Law which set a $15 minimum hourly wage for New York fast-food workers, and which only applied to fast-food establishments with thirty or more locations.  The court upheld that law, finding "no differential treatment of . . . similarly situated in-state and out-of-state interests" because 'if a fast-food chain has at least 30 establishments anywhere in the United States, its component establishments in New York are subject to the wage order."  *Id.* at 239 (cleaned up).  The metric thus "can in no way be read to exclude chains with locations solely in New York."  *Id.*

often to out-of-state entities in a market that has more out-of-state than in-state participants." (internal quotation marks omitted)).  That is because the dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp.*, 437 U.S. at 127–28.  Its doctrine is animated by "concern about economic protectionism" or those measures "designed to benefit in-state economic interests by burdening out-of-state competitors"—not laws that primarily regulate firms operating across state lines.  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008).  And so, a law is only clearly discriminatory in its effect where it "confer[s] a competitive advantage upon local business vis-à-vis out-of-state competitors." *Town of Southold*, 477 F.3d at 49.

Here, Plaintiffs have failed to make the requisite showing that the Wrongful Discharge Law applies in a way that benefits in-state competitors at the expense of out-of-state competitors.  Any burdens imposed by the Law are highly localized.  The Law does not impose direct costs on out-of-state franchisors or any other out-of-state entity—only individual restaurants operating in New York City.  Put

otherwise, at the restaurant level, every restaurant to which the Law applies is an in-state business; and at the chain level, the Law applies equally regardless of where a franchise is headquartered. So, for example, the Law imposes the same burdens on a local franchisee of a New York-based interstate chain like Shake Shack or Nathan's Famous as it does on a local franchisee of an interstate chain headquartered outside New York.

In light of the Law's highly local costs, Plaintiffs have failed to prove "that costs will be imposed on out-of-state firms, out-of-state firms will be at a competitive disadvantage, out-of-state businesses will close, or that new out-of-state firms will not enter the market." *Int'l Franchise Ass'n*, 803 F.3d at 406. Instead, to the extent the Law has an effect, "its primary or perhaps exclusive effect is to harm in-state firms—franchisees located in [New York City]." *Id.* These in-state firms in New York City will presumably face higher compliance costs relative to franchisees outside of New York City and non-franchisees that are not subject to the Law's requirements. And these in-state costs are especially significant because the Supreme Court has instructed that "[n]ondiscriminatory measures . . . are

47

generally upheld, in spite of any adverse effects on interstate commerce, in part because the existence of major in-state interests adversely affected is a powerful safeguard against legislative abuse." *West Lynn Creamery*, 512 U.S. at 200 (cleaned up).

In arguing otherwise, Plaintiffs rely primarily on the Eleventh Circuit's reasoning in *Cachia v. Islamorada*, 542 F.3d 839 (11th Cir. 2008), which held that a city zoning law prohibiting the operation of chain restaurants had the "practical effect of discriminating against interstate commerce." *Id.* at 843. But the law in *Cachia* and New York's Wrongful Discharge Law are incomparable. In *Cachia*, the Eleventh Circuit acknowledged the Supreme Court's warning in *Exxon* that the Commerce Clause does not prescribe a "particular structure or methods of operation in a retail market." *Id.* (quoting *Exxon Corp.*, 437 U.S. at 127). It reasoned, however, that the zoning law at issue fell outside of the rule because "the ordinance's complete prohibition of chain restaurants . . . amounts to more than the regulation of methods of operation, and serves to exclude national chain restaurants from competition in the local market." *Id.* New York's Wrongful

Discharge Law, however, merely regulates methods of operation. And "impos[ing] additional burdens on" franchises and other chain restaurants does not conflict with *Cachia* because such laws do "not limit competition by prohibiting chain retailers and restaurants" entirely. *Int'l Franchise Ass'n, Inc.*, 803 F.3d at 404 n.7. Where, as here, a statute does not "prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market," heightened scrutiny is unwarranted. *Exxon Corp.*, 437 U.S. at 126.

Plaintiffs argue in turn that any direct local costs imposed on New York City-based franchisees are, in effect, costs to interstate restaurant chains as a whole because compliance costs disincentivize restaurant operators in New York City from entering franchise agreements with out-of-state chains. But beyond citing speculative "conversations with restaurant operators" and "restaurant chains," appellants do not put forward any factual allegations suggesting that franchise royalties or profits will diminish as a result of the Wrongful Discharge Law, and cannot explain how or why expansion of out-of-state companies will be

49

significantly diminished.  In any event, any incidental burdens imposed by New York's law on interstate businesses fall far short of the practical effects of the law struck down in *Cachia*, which totally excluded national chains from competition in the local market.  At worst, the Wrongful Discharge Law imposes no more "than an indirect burden on interstate restaurant operations."  *Cachia*, 542 F.3d at 843.

Because the Wrongful Discharge Law does not discriminate against interstate commerce, we will uphold it under the *Pike* balancing test unless Plaintiffs can show that the incidental burden it imposes on such commerce is "clearly excessive" in relation to the local benefits.  397 U.S. at 142.  They cannot. Indeed, Plaintiffs do not even attempt to argue that the Law fails *Pike* balancing, choosing instead to argue only that the law has discriminatory effects.  In any event, we gather that the potential incidental burdens on interstate commerce amount to the hypothetical compliance costs carried by interstate fast-food businesses that implement the requisite discharge policies in New York City.[8]

---

[8] Of course, the Law takes chain size into consideration, regardless of the locations of such chains, because larger businesses have larger economies of scale and are better situated to absorb compliance costs.

The City, on the other hand, has identified a multitude of local benefits associated with the Wrongful Discharge Law—benefits that are clearly unrelated to economic protectionism and easily outweigh any incidental burdens. In enacting the Law, the New York City Council took seriously the fact that complaints of wrongful discharge are common in the fast-food industry, which employs over 67,000 workers at approximately 3,000 establishments in New York City. App'x 1519–20. The City enacted the Wrongful Discharge Law to protect vulnerable fast-food employees from the financial hardships—e.g., homelessness, food insecurity, loss of resources to pay for child care—caused by arbitrary reductions in hours and terminations. It did so after compiling ample legislative findings concerning substandard working conditions in the industry, including abusive workplace practices, pervasive unjustified firings, and the resulting economic instability for a vulnerable class of workers. *See, e.g.,* App'x 1515–39.

New York's Wrongful Discharge Law thus easily survives scrutiny under *Pike*. Accordingly, we conclude that New York's Wrongful Discharge Law is a

51

proper exercise of the City's authority and does not violate the dormant Commerce Clause.

## CONCLUSION

For the reasons stated above, we hold that New York's Wrongful Discharge Law is neither preempted by the NLRA nor violative of the Dormant Commerce Clause. Instead, the Law represents an unexceptional exercise of the City's traditional power to regulate and define minimum labor standards.

Accordingly, the judgment of the United States District Court for the Southern District of New York is **AFFIRMED**.